*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE 2021 ) | |
| REDISTRICTING CASES ) | Supreme Court Nos. 18332/18419 |
| (Matanuska-Susitna Borough, S-18328) ) | (Consolidated) |
| (City of Valdez, S-18329) ) | |
| (Municipality of Skagway, S-18330) ) | Superior Court No. 3AN-21-08869 CI |
| (Alaska Redistricting Board, S-18332) ) | |
| (Alaska Redistricting Board, S-18419) ) | O P I N I O N |
| ) | |
| ) | No. 7646 – April 21, 2023 |

Petitions for Review from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Matthew Singer, Lee C. Baxter, and Kayla J. F. Tanner, Schwabe, Williamson & Wyatt, P.C., Anchorage, for Petitioner/Respondent Alaska Redistricting Board. Robin O. Brena and Jon S. Wakeland, Brena, Bell & Walker, P.C., Anchorage, for Petitioners/Respondents Municipality of Skagway Borough and Brad Ryan. Robin O. Brena, Jake W. Staser, Jon S. Wakeland, and Laura S. Gould, Brena, Bell & Walker, P.C., Anchorage, for Petitioners/Respondents City of Valdez and Mark Detter. Stacey C. Stone, Holmes Weddle & Barcott, P.C., Anchorage, for Petitioners/Respondents Matanuska-Susitna Borough and Michael Brown. Holly C. Wells, Mara E. Michaletz, and Zoe A. Danner, Birch Horton Bittner & Cherot, Anchorage, for Respondents Felisa Wilson, George Martinez, and Yarrow Silvers. Eva R. Gardner, Michael S. Schechter, and Benjamin J. Farkash, Ashburn & Mason, P.C., Anchorage, for Respondents Calista Corporation, William Naneng, and Harley Sundown in No. S-18332 and for Respondents Louis Theiss, Ken Waugh, and Jennifer

Wingard in No. S-18419. Nathaniel H. Amdur-Clark and Whitney A. Leonard, Sonosky, Chambers, Sachse, Miller & Monkman, LLP, Anchorage, for Intervenor Respondents Doyon Limited; Tanana Chiefs Conference; Fairbanks Native Association; Ahtna, Inc.; Sealaska Corporation; Donald Charlie, Sr.; Rhonda Pitka; Cherise Beatus; and Gordon Carlson in No. S-18332. Susan Orlansky and Richard Curtner, American Civil Liberties Union of Alaska Foundation, Anchorage, for Amici Curiae Alaska Black Caucus; National Association for the Advancement of Colored People Anchorage, Alaska Branch #1000; Enlaces; The Korean American Community of Anchorage, Inc.; Native Movement; and First Alaskans Institute in No. S-18332.

Before: Winfree, Chief Justice, Borghesan and Henderson, Justices, and Matthews and Eastaugh, Senior Justices.[*] [Maassen and Carney, Justices, not participating.]

WINFREE, Chief Justice.
EASTAUGH, Senior Justice, concurring.

## I. INTRODUCTION

Alaska's legislative redistricting occurs every decade shortly after the United States decennial census is released, governed primarily by the Alaska Constitution. The most recent redistricting efforts began in earnest in August 2021, shortly after the 2020 census information was received. On November 10 the Alaska Redistricting Board adopted a final redistricting plan for 40 House of Representative districts and 20 Senate districts (each composed of 2 House districts). Five separate challenges to the final plan were filed in superior court. In mid-February 2022 the superior court concluded that two House districts were unconstitutional on due-process-

---

[*] Sitting by assignment made under article IV, section 16 of the Alaska Constitution.

related grounds and that one unrelated Senate district was unconstitutional on gerrymander grounds. The superior court directed further redistricting efforts.

Four petitions for our review quickly were filed, and we granted review. The primary competing claims were that the superior court erred (1) by concluding that the two House districts and the Senate district were unconstitutional, and (2) by *not* concluding that (a) the two House districts were unconstitutional for additional reasons and (b) other House districts also were unconstitutional. In an expedited summary order we reversed the superior court's ruling regarding the two House districts, affirmed the superior court's ruling regarding the Senate district, and, with one limited exception, affirmed the superior court's ruling that the remaining disputed House districts satisfied constitutional requirements. We remanded for further redistricting efforts consistent with our order.

The Board adopted an amended final plan in mid-April 2022 and another challenge was filed in superior court; in mid-May the superior court concluded that the amended plan's revision for the previously unconstitutional Senate district also was an unconstitutional gerrymander. The superior court directed that an alternative amended plan, previously considered by the Board but not adopted as the amended final plan, be used as an interim plan for the November 2022 elections and that further redistricting efforts be undertaken for a second amended final plan for the rest of the decade. A petition for our review quickly was filed, challenging the superior court's rulings on the merits of the amended plan and contending that using the interim plan was erroneous. We granted review and stayed the superior court's order pending our ruling; in an expedited summary order we affirmed the superior court's conclusion that the relevant Senate district pairings were an unconstitutional gerrymander, affirmed the superior court's order for the interim redistricting plan, and lifted the stay except for the stay of further redistricting efforts pending our formal written decision.

We now explain the reasoning behind our summary orders. For context we start with Alaska's constitutional framework for redistricting. We then detail the parties' arguments in the first round of petitions for review and explain our first summary order. We next detail the parties' arguments in the final petition for review and explain our second summary order, including the implementation of an interim redistricting plan for the November 2022 election cycle. Finally, we lift the stay on further redistricting efforts and explain what must be accomplished to successfully implement a final redistricting plan for the remainder of the decade.

## II. CONSTITUTIONAL BACKDROP

### A. Article VI, Section 6: Substantive Standards; Gerrymandering Concerns

Article VI, section 6 sets out House and Senate district requirements.[1] A House district shall "contain a population as near as practicable" to 1/40th of the State's total population.[2] House districts must be contiguous and compact and must "contain[] as nearly as practicable a relatively integrated socio-economic area."[3] We have explained that a House district is contiguous if it is not split into separate parts.[4] But, of course: "Absolute contiguity of land masses is impossible in Alaska, considering her numerous archipelagos. Accordingly, a contiguous district may contain some amount

---

[1] Article VI, § 4 provides for 40 House districts and 20 Senate districts composed of 2 House districts each. *Cf.* article VI, § 6 (stating that Senate district "shall be composed *as near as practicable* of two contiguous [H]ouse districts" (emphasis added)).

[2] Alaska Const. art. VI, § 6.

[3] *Id.*

[4] *See Hickel v. Se. Conf.*, 846 P.2d 38, 45 (Alaska 1992), *as modified on denial of reh'g* (Mar. 12, 1993).

of open sea."[5]

Compactness and socioeconomic integration are important constraints on technically contiguous House districts stretching to Alaska's distant regions.[6] A House district is more compact when its perimeter is small relative to its area;[7] although irregular shapes are expected because of Alaska's geography, oddly placed corridors and appendages are suspect.[8] Socioeconomic integration is a more nebulous concept. We have explained that, in general, the constitutional convention delegates intended House districts to group people living in neighboring areas and following "similar economic pursuits."[9] Although the Constitution uses flexible language, such as "as nearly as practicable" and "relatively," to describe the socioeconomic integration requirement, we have said that socioeconomic integration may be sacrificed "only to maximize the other constitutional requirements of contiguity and compactness."[10] A House district contained entirely within a borough by definition meets the socioeconomic integration requirement.[11] But socioeconomic integration otherwise generally requires "proof of

---

[5]    *Id.*

[6]    *Id.* at 45-46.

[7]    *Id.* at 45.

[8]    *Id.* at 45-46.

[9]    *Id.* at 46-47.

[10]    *Id.* at 45 n.10.

[11]    *In re 2001 Redistricting Cases* (*2001 Redistricting I*), 44 P.3d 141, 146 (Alaska 2002) (referring to Anchorage, a consolidated city and borough, as "by definition socio-economically integrated"); *Hickel*, 846 P.2d at 51 ("By statute, a borough must have a population which 'is interrelated and integrated as to its social, cultural, and economic activities.' " (quoting AS 29.05.031)). *Cf. id.* at 51 n.20 (stating

(continued...)

actual interaction and interconnectedness rather than mere homogeneity."[12]

A "[S]enate district shall be composed as near as practicable of two contiguous [H]ouse districts,"[13] meaning that the two House districts comprising a Senate district must share a border. Compactness and relative socioeconomic integration requirements do not explicitly apply to Senate districts.[14] But local government boundaries may be given consideration when creating election districts,[15] and, when describing election district boundaries, "[d]rainage and other geographic features shall be used."[16] These factors — contiguity, adherence to local boundaries, and reliance on geographic features — reflect a desired measure of interconnectedness between the

---

[11] (...continued)
that splitting "a borough which otherwise [could] support an election district will be an indication of gerrymandering . . . for not preserving the government boundaries").

[12] *Hickel*, 846 P.2d at 46 (quoting *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1363 (Alaska 1987)).

[13] Alaska Const. art. VI, § 6.

[14] *Cf. id.* (expressly requiring consideration of compactness and socioeconomic integration only for House districts); *see also Kenai Peninsula*, 743 P.2d at 1365 & n.21 (explaining, under former article VI, § 6, that "provisions of article VI, section 6 which set forth socio-economic integration, compactness and contiguity requirements are inapplicable to redistricting and reapportionment of [S]enate districts" but also noting that "[S]enate districts which meander and ignore political subdivision boundaries and communities of interest will be suspect under the Alaska equal protection clause"); *Braun v. Denali Borough*, 193 P.3d 719, 730 (Alaska 2008) (noting we have declined to extend socioeconomic integration requirement to Senate districts (citing *Kenai Peninsula*, 743 P.2d at 1365)).

[15] Alaska Const. art. VI, § 6; *cf. Hickel*, 846 P.2d at 51 n.20 (stating that splitting "a borough which otherwise [could] support an election district will be an indication of gerrymandering for not preserving the government boundaries").

[16] Alaska Const. art. VI, § 6.

House districts that are combined to form a Senate district.

Ample evidence illustrates the constitutional convention delegates' intent to protect against gerrymandering when they drafted article VI, section 6.[17]  As adopted, section 6 contained guiding language for constructing House districts nearly identical to its current text:  "Each new district so created shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area.  Each shall contain a population at least equal to the quotient obtained by dividing the total civilian population by [40]."[18]  Delegate John Hellenthal, chair of the Committee on Suffrage, Elections, and Apportionment, explained that the committee's proposed

---

[17]     *See generally* Gordon S. Harrison, Comment, *The Aftermath of* In Re 2001 Redistricting Cases:  *The Need for a New Constitutional Scheme for Legislative Redistricting in Alaska*, 23 ALASKA L. REV. 51, 55-57 (2006) (discussing constitutional convention proceedings in which delegates explained desire to prevent gerrymandering and how proposed provisions would prevent such practices).  Although the delegates usually referred to "gerrymandering" in general, without specifying concerns about partisan gerrymandering in particular, context clues discussed next plainly demonstrate that partisan gerrymandering was at the front of their minds.  Furthermore, the delegates likely used "gerrymander" in accordance with its contemporaneous legal usage:

> A name given to the process of dividing a state or other territory into the authorized civil or political divisions, but with such a geographical arrangement as to accomplish a sinister or unlawful purpose, as, for instance, to secure a majority for a given political party in districts where the result would be otherwise if they were divided according to obvious natural lines . . . .

*Gerrymander*, BLACK'S LAW DICTIONARY (4th ed. 1951).

[18]     Former Alaska Const. art. VI, § 6 (1956).  In *Egan v. Hammond* we struck down the language specifying that reapportionment be based on the "civilian population," excluding military personnel as a class, under the U.S. Constitution.  502 P.2d 856, 869 (Alaska 1972).

contiguity, compactness, socioeconomic integration, and population quotient requirements acted together to "prohibit[] gerrymandering which would . . . take place were 40 districts arbitrarily set up by the [redistricting entity]."[19] As we discuss below, he expressed similar gerrymandering concerns when discussing who would apply these standards.

In *Hickel v. Southeast Conference* we expressly noted that "[t]he requirements of contiguity, compactness and socio-economic integration were incorporated by the framers of the reapportionment provisions to prevent gerrymandering."[20] We also pointed to both *Carpenter v. Hammond* and Black's Law Dictionary when defining gerrymandering broadly as "the dividing of an area into political units 'in an unnatural way with the purpose of bestowing advantages on some and thus disadvantaging others.' "[21]

Gerrymandering often takes one of two forms, "packing" or "cracking."[22]

---

[19] 3 Proceedings of the Alaska Constitutional Convention (PACC) 1846 (Jan. 11, 1956) (statement of Del. John S. Hellenthal); *see* Harrison, *supra* note 17 at 56 (providing Delegate Hellenthal's title).

[20] 846 P.2d at 45; *see also Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1367-68 (Alaska 1987) (discussing how gerrymandering that purposefully "exclude[s] a certain group from political participation" may violate right to fair and effective representation under equal protection analysis).

[21] *Hickel*, 846 P.2d at 45 & n.11 (quoting *Carpenter v. Hammond*, 667 P.2d 1204, 1220 (Alaska 1983) (Matthews, J., concurring) and citing BLACK'S LAW DICTIONARY (6th ed. 1990)). We understand the words "natural" and "unnatural" in the definitions of gerrymandering (*see* text above and *supra* note 17) to be relative terms denoting the extent to which districts comply with or depart from traditional redistricting principles such as those set out in article VI, § 6 of the Constitution.

[22] Royce Crocker, *Congressional Redistricting: An Overview*, CONGRESSIONAL RESEARCH SERVICE 15 (Nov. 21, 2012).

"Packing" occurs when groups of voters of similar expected voting behavior are unnaturally concentrated in a single district; this may create a "wasted" excess of votes that otherwise might have influenced candidate selection in one or more other districts.[23] "Cracking" occurs when like-minded voters are unnaturally divided into two or more districts; this often is done to reduce the split group's ability to elect a candidate of its choice.[24] But if a group constitutes a supermajority, splitting it into two districts also may enhance its power by enabling it to elect candidates in both districts. Another form is incumbent gerrymandering: "a redistricting plan that favors incumbents, often without regard for their partisan affiliation, and aims to maintain the status quo with respect to the parties' distribution of seats within a state and to protect incumbents."[25]

### B. Article VI, Sections 3 And 8: Redistricting Entity; Gerrymandering Concerns

The Constitution originally placed redistricting powers with the governor, who was to appoint an independent advisory board to assist in the redistricting process.[26] The advisory board was to consist of five members.[27] At least one member was to be selected from each of four specified areas of the state, none could be a public employee

---

[23]    *Id.*

[24]    *Id.* at 5, 15.

[25]    *Id.* at 6.

[26]    Former Alaska Const. art. VI, §§ 3, 8 (1956); *see Carpenter*, 667 P.2d at 1206 & n.1 (discussing process for 1980 redistricting cycle; noting article VI, § 3 authorizing governor to conduct redistricting and article VI, § 8 directing governor to appoint advisory redistricting board).

[27]    Former Alaska Const. art. VI, § 8.

or official, and all were to be appointed "without regard to political affiliation."[28] Delegate Hellenthal explained that a governor's reliance on the advisory board's advice and compliance with article VI, section 6 would limit gerrymandering.[29] He also focused on limiting gerrymandering when discussing nuances of proposed terminology for article VI, section 8.[30] He unsuccessfully advocated for the use of the word "nonpartisan" in section 8's description of advisory board members, explaining that "the whole purpose of this article [was] to de-emphasize politics."[31] But he successfully advocated for a prohibition against board members also simultaneously serving as public officials or employees, reasoning that "a public official was too politically inclined" and that public employees "likewise would be subject to political pressures."[32]

When Delegate Hellenthall presented his committee's proposal for constitutional redistricting provisions, he said:

> [T]he goal of all apportionment plans is simple[.] [T]he goal is adequate and true representation by the people in their elected legislature[:] true, just, and fair representation. And in deciding and in weighing this plan, never lose sight of that

---

[28]    *Id.*

[29]    3 PACC 1846 (Jan. 11, 1956) (statement of Del. John S. Hellenthal).

[30]    3 PACC 1846 (Jan. 11, 1956) (statement of Del. John S. Hellenthal).

[31]    3 PACC 1958-60 (Jan. 12, 1956) (statement of Del. John S. Hellenthal and ensuing debate).

[32]    3 PACC 1955 (Jan. 12, 1956) (statement of Del. John S. Hellenthal); *see also* 3 PACC 1956-57 (Jan. 12, 1956) (statement of Del. Steve McCutcheon) (expressing concerns about special interest groups influencing redistricting and supporting prohibition against public officials serving as Board members because "[i]t is one small board that sits once every 10 years and certainly we should be able to find five or six people out of the whole of Alaska [who] would qualify . . . and who will be objective in their consideration").

goal, and keep it foremost in your mind; and the details that we will present are merely the details of achieving true representation, which, of course, is the very cornerstone of a democratic government.[33]

Delegate Hellenthall clearly believed the end result was a "modern and progressive" framework for true, just, and fair legislative representation for all Alaskans.[34] But litigation during the first three redistricting cycles after statehood[35] led to 1999 constitutional amendments removing redistricting from the governor's control and

---

    [33]    3 PACC 1835 (Jan. 11, 1956) (statement of Del. John S. Hellenthal).

    [34]    John S. Hellenthal, *Alaska's Heralded Constitution: The Forty-Ninth State Sets an Example*, 44 A.B.A. J. 1447, 1148-49 (1958) (describing one of several "modern and progressive features" of Alaska Constitution as creating "truly representative legislature" and "[a]utomatic reapportionment every ten years by the governor acting on the advice of an *independent* board" (emphasis added)).

    [35]    *See generally* Harrison, *supra* note 17, at 58-60 (describing redistricting litigation in 1990, 1980, and 1970 redistricting cycles when governors controlled process). As the Comment reflects, we resolved challenges in those redistricting cycles by twice agreeing with challenges (one led by future Republican Governor Jay Hammond and one by Republican Senator Cliff Groh) to Democrat Governor William Egan's redistricting efforts; agreeing with challenges to Republican Governor Jay Hammond's redistricting efforts; agreeing with challenges to Democrat Governor William Sheffield's redistricting efforts (in redistricting efforts begun by Republican Governor Jay Hammond); and agreeing with challenges to Alaskan Independence Party Governor Walter Hickel's redistricting efforts. *Id.*; *see also Hickel v. Se. Conf.*, 846 P.2d 38, 57 (Alaska 1992) (holding plan unconstitutional for several article VI, section 6 violations); *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1373 (Alaska 1987) (holding Senate district unconstitutional due to discriminatory intent and disproportionality though not remanding due to de minimis effect); *Carpenter v. Hammond*, 667 P.2d 1204, 1215 (Alaska 1983) (holding plan unconstitutional due to record "devoid of evidence of" socioeconomic integration within the House district at issue); *Groh v. Egan*, 526 P.2d 863, 882 (Alaska 1974) (holding plan unconstitutional due to unjustifiable population variances); *Egan v. Hammond*, 502 P.2d 856, 866-68 (Alaska 1972) (same).

placing it in the hands of a constitutionally created Redistricting Board, while preserving essentially the same redistricting standards.[36] The existing board member qualifications remained,[37] but a new appointment process was put in place.[38] Appointments now are made in the following order: the governor appoints two members, the presiding officer of the Senate appoints a member, the presiding officer of the House of Representatives appoints a member, and the Chief Justice of the Alaska Supreme Court appoints the final member.[39] There must be at least one member from each of the four state judicial districts.[40] The members serve until all redistricting plan challenges have been resolved and a final redistricting plan has been implemented.[41] No member may be a legislative candidate in the general election following the final redistricting plan's implementation.[42]

Legislative history and information presented to those voting on the amendments reflect considerable focus on limiting gerrymandering. Representative

---

[36] *Compare* former Alaska Const. art. VI, §§ 6, 8 (instructing governor to appoint each member of board, which serves in advisory role to governor, and to redistrict according to contiguity, compactness, socioeconomic integration, and population quotient requirements), *with* Alaska Const. art. VI, §§ 6, 8 (expanding board member appointment authority to other government officials, removing limitation that board serve in advisory capacity, and maintaining substantive redistricting requirements).

[37] Alaska Const. art. VI, § 8(a) (providing appointments shall be made without regard to political affiliation and members may not be public officials or employees while serving on board); Alaska Const. art. VI § 8(b) (providing for geographic representation).

[38] Alaska Const. art. VI, § 8(b).

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] Alaska Const. art. VI, § 8(c).

Brian Porter, a legislative sponsor of the constitutional amendment resolution, repeatedly emphasized the intent to have a more objective and non-partisan redistricting process.[43] Representative Jeannette James supported the goal of eliminating gerrymandering because "to make [redistricting] be an advantage for one party or the other, no matter which it is," did not serve the public.[44] Representative Ethan Berkowitz recognized the need to reduce historical gerrymandering,[45] while Representative Con Bunde also noted the judiciary's check against gerrymandering.[46] State senators similarly indicated an intent to deter partisan politics during the redistricting process,[47]

---

[43] Testimony of Brian Porter, Representative, Resolution Sponsor, Tape 98-44, Side B, No. 128, Hearing on H.J.R. 44 Before Sen. Jud. Comm., 20th Leg., 2d Sess. (Apr. 29, 1998); Testimony of Brian Porter, Representative, Resolution Sponsor, Tape 98-49, Side B at 1:14:58-15:17, 1:19:31-20:24, Hearing on H.J.R. 44 Before the H. Fin. Comm., 20th Leg., 2d Sess. (Mar. 3, 1998).

[44] Comment of Jeannette James, Representative, Tape 98-12, Side A, No. 1669, Hearing on H.J.R. 44 Before the H. Jud. Comm., 20th Leg., 2d Sess. (Feb. 6, 1998).

[45] Statement of Ethan Berkowitz, Representative, Tape 98-15, Side A, No. 2326, Hearing on H.J.R. 44 Before the H. Jud. Comm., 20th Leg., 2d Sess. (Feb. 11, 1998).

[46] Statement of Con Bunde, Representative, Vice Chairman, Tape 98-15, Side B, No. 241 at 53:25-54:05, Hearing on H.J.R. 44 Before the H. Jud. Comm., 20th Leg., 2d Sess. (Feb. 11, 1998).

[47] Senator Drue Pearce suggested support for an earlier draft amendment under which the Board would have been appointed entirely by supreme court justices, keeping elected officials completely out of the process. Comment of Drue Pearce, Senator, Tape 98-161, Side A, Hearing on H.J.R. 44 Before the Sen. Fin. Comm., 20th Leg., 2d Sess. (May 8, 1998). Responding to critiques from a Department of Law representative that Board appointments by the governor "provide[d] an important safety valve" that would "protect the interest of the people," Senator Sean Parnell insisted that

(continued...)

and a formal legislative analysis referred to avoiding partisan political influence on redistricting as the amendments' reason and intent.[48] To the extent we can determine the voters' intent when approving the 1999 amendments,[49] both proponents and opponents of the amendments believed their positions limited gerrymandering.[50]

## C. Related Constitutional Provisions And Concerns

### 1. Equal protection

The United States and Alaska Constitutions guarantee equal protection

---

[47]     (...continued)
the pre-amendment system was the most partisan option and that the courts were the true safety valve.  Comment of Sean Parnell, Senator, Tape 161, Side A, Hearing on H.J.R. 44 Before the Sen. Fin. Comm., 20th Leg., 2d Sess. (May 8, 1998).

[48]     *See* H. Jud. Comm., Sectional Analysis of Proposed H.J.R. 44, 20th Leg., 2d Sess. at 1 (Feb. 4, 1998) (explaining changes to board selection process as "intended to remove reapportionment and redistricting as far as possible from the partisan political arena").

[49]     *See Wielechowski v. State*, 403 P.3d 1141, 1150 (Alaska 2017) (looking to "any published arguments . . . to determine what meaning voters may have attached to the [proposed constitutional amendment]," including ballot initiative language, news articles, and sponsor statements (alterations in original) (quoting *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 193 (Alaska 2007))).

[50]     The statement supporting the amendments, advocated by Representatives Brian S. Porter and Eldon Mulder, criticized the former redistricting procedure and plans for "being partisan and gerrymandered rather than creating redistricting plans based on bipartisan fairness and objectivity."  *State of Alaska Official Election Pamphlet* 100 (Region III ed., Nov. 3, 1998).  Amendment opponents represented by Deborah Bonito, then-Chair of the Alaska Democratic Party, were concerned that the amendment would "allow[] legislators to be directly involved in who determines the legislative lines they are subject to" and reduce the role of the governor, "Alaska's only elected official without a direct interest in the shape of individual election districts."  *Id.* at 100-01.

under the law.[51] "In the context of voting rights in redistricting and reapportionment litigation, there are two principles of equal protection, namely that of 'one person, one vote' — the right to an equally weighted vote — and of 'fair and effective representation' — the right to group effectiveness or an equally powerful vote."[52] Fair representation, although "not a fundamental right, . . . represent[s] a significant constitutional interest."[53] We have explained that, unlike the "quantitative" one person, one vote inquiry, the fair representation question is "qualitative" and "more nebulous."[54] But Alaska's fair representation standard is stricter than the federal standard because Alaska's equal protection clause requires a more demanding review than its federal analog.[55]

---

[51]    U.S. Const. amend. XIV, § 1; Alaska Const. art. I, § 1.

[52]    *Hickel v. Se. Conf.*, 846 P.2d 38, 47 (Alaska 1992) (quoting *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1366 (Alaska 1987)).

[53]    *Kenai Peninsula*, 743 P.2d at 1372.

[54]    *Hickel*, 846 P.2d at 47, 48-49.

[55]    *Braun v. Denali Borough*, 193 P.3d 719, 731 (Alaska 2008) ("In the context of reapportionment cases, the Alaska Constitution's equal protection standard is stricter than its federal counterpart."); *Hickel*, 846 P.2d at 49 ("The equal protection clause of the Alaska Constitution imposes a more strict standard than its federal counterpart."); *see also Ross v. State, Dep't of Revenue*, 292 P.3d 906, 910-11 (Alaska 2012) (explaining that Alaska's equal protection clause is "more demanding" than its federal counterpart); *Kenai Peninsula*, 743 P.2d at 1371 (explaining that when "no fundamental right [is] at stake, the equal protection clause of the Alaska Constitution imposes a stricter standard than its federal counterpart").

    A redistricting plan satisfying Alaska's more stringent requirements thus likely survives federal scrutiny; a plan failing to meet Alaska's requirements is invalid regardless of federal law. *Cf. Ross*, 292 P.3d at 910-11 (explaining that, because of "more demanding" standards, "if [a] rule does not violate Alaska's Equal Protection

(continued...)

In *Kenai Peninsula Borough v. State* we set out the controlling three-step equal protection analysis in redistricting, requiring an inquiry into and a balancing of competing voter and state interests.[56] First, what is the nature of the individual's constitutional interest at stake and what weight should it be given?[57] Second, what is the purpose of the state action and, to counterbalance the weight given to the individual's interest, what level of importance must it have?[58] Third, assuming the state action has a proper purpose, how close must the relationship be between the state's purpose and its chosen means?[59] Nonetheless, if the purpose is intended discrimination against a class of voters, the purpose will be considered illegitimate without needing to ask about the relationship between purpose and efficacy; an equal protection violation will be established absent a demonstration that a greater proportionality of representation will result from its action.[60]

---

[55]    (...continued)
Clause, it does not violate the federal Equal Protection Clause").

[56]    743 P.2d at 1371; *see also Braun*, 193 P.3d at 731.

[57]    *Kenai Peninsula*, 743 P.2d at 1371 (stating that nature of interest is most important variable and that primacy of interest fixes review level and burden state has to justify action).

[58]    *Id.* (stating that, depending on review level, state purpose ranges from legitimate objective (low end) to compelling state interest (high end)).

[59]    *Id.* (stating that, depending on review level, fit between state's means and ends ranges from substantial relationship (low end) to close fit (high end) and that purpose must be implemented with least restrictive alternative).

[60]    *Id.* at 1372; *Braun*, 193 P.3d at 731 (summarizing *Kenai Peninsula* holding). To the extent that *Braun*, *id.*, and *2001 Redistricting 1*, 44 P.2d 141, 144 (Alaska 2002), might suggest that intentional discrimination is a required element of an equal protection claim in the redistricting context, we disavow that language.

When determining whether a Board has discriminatory intent, courts should look to the "totality of the circumstances," including the Board's process and the substance of its decision.[61] As we explained in *Kenai Peninsula*:

> Wholesale exclusion of any geographic area from the reapportionment process and the use of any secretive procedures suggest an illegitimate purpose. District boundaries which meander and selectively ignore political subdivisions and communities of interest, and evidence of regional partisanship are also suggestive. The presentation of evidence that indicates, when considered with the totality of the circumstances, that the Board acted intentionally to discriminate against the voters of a geographic area will serve to compel the Board to demonstrate that its acts aimed to effectuate proportional representation.[62]

Districts drawn with an illegitimate purpose are unconstitutional even if the negative effect on proportional representation is slight,[63] but the harm's extent becomes more relevant when fashioning a remedy.[64] For example, in *Kenai Peninsula* we granted declaratory relief, as opposed to requiring the Board to redraw the challenged district, because the disproportionate representation was de minimis.[65]

---

[61]     *Kenai Peninsula*, 743 P.2d at 1372.

[62]     *Id.*

[63]     *Id.*

[64]     *Id.* at 1373 ("[T]he degree of disproportionality will be considered in determining the appropriate relief to be granted.").

[65]     *Id.*

### 2. Due process

The Alaska Constitution mandates that "[n]o person shall be deprived of life, liberty, or property, without due process of law."[66] Due process has both a procedural and a substantive component.[67] Procedural due process "requires that adequate and fair procedures be employed when state action threatens protected life, liberty, or property interests."[68] "At a minimum, due process requires that the parties receive notice and an opportunity to be heard."[69] "Substantive due process is a doctrine that is meant to guard against unfair, irrational, or arbitrary state conduct that 'shock[s] the universal sense of justice.' "[70] As the superior court pointed out, courts in other jurisdictions have found due process violations if state action "seriously undermine[s] the fundamental fairness of the electoral process."[71]

We have not previously explored how the due process clause may apply to redistricting challenges,[72] but due process issues are raised tangentially in the matters before us. We note these issues when relevant, but, as we will explain, we see no need to delve into them at this time.

---

[66] Alaska Const. art. I, § 7.

[67] *Doe v. State, Dep't of Pub. Safety*, 444 P.3d 116, 124-25 (Alaska 2019).

[68] *Id.* at 124.

[69] *Haggblom v. City of Dillingham*, 191 P.3d 991, 995 (Alaska 2008).

[70] *Doe*, 444 P.3d at 125 (alteration in original) (quoting *Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1130 (Alaska 1999)).

[71] *See, e.g.*, *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981).

[72] *Cf. 2001 Redistricting I*, 44 P.3d 141, 147 (Alaska 2002) (holding only that challengers' due process claims "ha[d] no merit").

### 3. The "*Hickel* Process" and the Voting Rights Act

The federal Voting Rights Act (VRA) — intended to protect the voting power of racial minorities — applies to state redistricting.[73] "Under section 5 of the [VRA], a reapportionment plan is invalid if it 'would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.' "[74] We have noted that a "state may constitutionally reapportion districts to enhance the voting strength of minorities in order to facilitate compliance with the [VRA]."[75]

In *Hickel* we issued a remand order directing the Board to follow an order of priorities relating to redistricting affected by the VRA:

> Priority must be given first to the Federal Constitution, second to the federal [VRA], and third to the requirements of article VI, section 6 of the Alaska Constitution. The requirements of article VI, section 6 shall receive priority *inter se* in the following order: (1) contiguousness and compactness, (2) relative socioeconomic integration, (3) consideration of local government boundaries, [and] (4) use of drainage and other geographic features in describing boundaries.[76]

But we cautioned that "[t]he [VRA] need not be elevated in stature so that

---

[73]    *Hickel v. Se. Conf.*, 846 P.2d 38, 49 (Alaska 1992); 52 U.S.C. §§ 10301-508.

[74]    *Hickel*, 846 P.2d at 49 (quoting *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1361 (Alaska 1987)).

[75]    *Id.* at 49-50 (quoting *Kenai Peninsula*, 743 P.2d at 1361).

[76]    *Id.* at 62.

the requirements of the Alaska Constitution are unnecessarily compromised."[77] We later clarified:

> The *Hickel* process provides the Board with defined procedural steps that, when followed, ensure redistricting satisfies federal law without doing unnecessary violence to the Alaska Constitution. The Board must first design a plan focusing on compliance with the article VI, section 6 requirements of contiguity, compactness, and relative socioeconomic integration; it may consider local government boundaries and should use drainage and other geographic features in describing boundaries wherever possible. Once such a plan is drawn, the Board must determine whether it complies with the [VRA] and, to the extent it is noncompliant, make revisions that deviate from the Alaska Constitution when deviation is "the only means available to satisfy [VRA] requirements."[78]

We also noted United States Supreme Court decisions subsequent to *Hickel* "establish[ing] that under the [VRA], a jurisdiction cannot unnecessarily depart from traditional redistricting principles to draw districts using race as 'the predominant, overriding factor.' "[79] We observed that "[f]ollowing the *Hickel* process will facilitate compliance with federal constitutional law by ensuring that traditional redistricting principles are not 'subordinated to race.' "[80]

---

[77]     *Id.* at 51 n.22.

[78]     *In re 2011 Redistricting Cases* (*2011 Redistricting I*), 274 P.3d 466, 467-68 (Alaska 2012) (quoting *Hickel*, 846 P.2d at 51 n.22).

[79]     *Id.* at 468 (footnote omitted) (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)).

[80]     *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 959 (1996)).

The Board's compliance with the *Hickel* process is challenged in the matters before us.

### D.    Article VI, Section 10:  Redistricting Process

Article VI, section 10(b) requires a majority vote of the Board to approve a redistricting plan.[81]  Section 10(a) outlines an expedited procedure the Board must follow when crafting a redistricting plan:

> Within thirty days after the official reporting of the decennial census of the United States or thirty days after being duly appointed, whichever occurs last, the board shall adopt one or more proposed redistricting plans.  The board shall hold public hearings on the proposed plan, or, if no single proposed plan is agreed on, on all plans proposed by the board.  No later than ninety days after the board has been appointed and the official reporting of the decennial census of the United States, the board shall adopt a final redistricting plan and issue a proclamation of redistricting.  The final plan shall set out boundaries of house and senate districts and shall be effective for the election of members of the legislature until after the official reporting of the next decennial census of the United States.

We have yet to construe several portions of section 10.  We have not previously decided whether a "proposed redistricting plan" includes both House and Senate districts.  We also have not previously decided whether the public hearings requirement applies to all plans put forward by the Board or only those promulgated within the initial 30 days.[82]  And we have not previously determined whether a plan

---

[81]    Alaska Const. art. VI, § 10(b).

[82]    We have characterized section 10's public hearings requirement as:

Under article VI, section 10 of the Alaska Constitution, the Alaska Redistricting Board . . . must adopt one or more

(continued...)

drafted by a third party and offered for public comment counts for the 30-day deadline's purposes. These questions are before us now.

### E. Article VI, Section 11: Plan Challenges

Article VI, section 11 gives "[a]ny qualified voter" the right to challenge the Board's final redistricting plan or compel the Board to perform its duties.[83] Original jurisdiction for such challenges lies with the superior court.[84] Appellate jurisdiction rests with this court, and we must review the case "on the law and the facts."[85] We review redistricting plans "de novo upon the record developed in the superior court,"[86] but, as in other matters, we afford some deference to the superior court's findings when it was "in the best position to decide the issue," such as for witness credibility.[87]

---

[82] (...continued)
proposed redistricting plans within 30 days after receiving official census data from the federal government. The Board must then hold public hearings on the proposed plans and adopt a final plan within 90 days of the census reporting.

*In re 2011 Redistricting Cases* (*2011 Redistricting III*), 294 P.3d 1032, 1033 (Alaska 2012). Although not based on any holding, this characterization implies that the public hearings requirement applies only to plans proposed within the 30-day window.

[83] Alaska Const. art. VI, § 11.

[84] *Id.*

[85] *Id.*

[86] *Groh v. Egan*, 526 P.2d 863, 867 (Alaska 1974).

[87] *See In re Hospitalization of Lucy G.*, 448 P.3d 868, 877-78 (Alaska 2019) (explaining that involuntary commitment and medication proceedings warrant clear error review of factual findings but independent review of superior court's decisions based on those factual findings); *Miller v. Fenton*, 474 U.S. 104, 114-15 (1985) (discussing situations, such as evaluating witness credibility, in which appellate court should defer
(continued...)

Courts review Board redistricting plans as if they were "a regulation adopted under a delegation of authority from the legislature to an administrative agency to formulate policy and promulgate regulations[:] . . . first to ensure that the agency has not exceeded the power delegated to it, and second to determine whether the regulation is reasonable and not arbitrary."[88]  Determining whether a regulation is reasonable primarily concerns whether "the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making."[89]  "[W]e always have authority to review the constitutionality of the action taken, but we . . . may not substitute [our] judgment as to the sagacity of a regulation for that of the administrative agency."[90]  Similarly we do not substitute our judgment as to the sagacity of a redistricting map

---

[87]     (...continued)
to trial court's application of law to fact); HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW: REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 24 (3d ed. 2018) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982)).

[88]     *Groh*, 526 P.2d at 866; *see also 2011 Redistricting III*, 294 P.3d at 1037. In *Groh* we justified this deferential standard of review to the Board based on the contemporary constitutional mandate that the executive branch was in charge of reapportionment.  *See* 526 P.2d at 866.  We have not yet considered the deference due a Board's decisions in light of the 1999 constitutional amendments, instead citing earlier cases for justification that the Board is treated the same as an administrative agency. *See, e.g.*, *2011 Redistricting III*, 294 P.3d at 1037 & nn.16-19.  Although the justification for deferring to the Board's decision no longer is the same, we still treat the Board as an administrative agency and afford it a more deferential standard of review given that its decision-making power is constitutionally vested, although it is unclear whether the Board has any particular "expertise" beyond its initial training sessions for appointed members.

[89]     *2001 Redistricting I*, 44 P.3d 141, 143 n.5 (Alaska 2002) (quoting *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001)).

[90]     *Groh*, 526 P.2d at 866-67.

adopted by the Board.

## III. 2021 REDISTRICTING PROCESS ROUND 1: BOARD'S FINAL PLAN; SUPERIOR COURT'S DECISION; PETITIONS FOR REVIEW

### A. Board Proceedings

The Board's five members were appointed in July and August 2020. Governor Mike Dunleavy appointed Budd Simpson (from Juneau, First Judicial District) and Bethany Marcum (from Anchorage, Third Judicial District); Senate President Cathy Giessel appointed John Binkley (from Fairbanks, Fourth Judicial District); House Speaker Bryce Edgmon appointed Nicole Borromeo (from Anchorage, Third Judicial District); and Chief Justice Joel Bolger appointed Melanie Bahnke (from Nome, Second Judicial District). The members elected Binkley as Board Chair.

The Board first met in September 2020, and it met numerous times through July 2021 for "organizational work, procurement, training and planning." Among other things, the Board selected an executive director, adopted policies, interviewed and selected legal counsel, hired a VRA consultant, received training on the redistricting software, and attended the National Conference of State Legislatures "Ready to Redistrict" conference.

On August 12 the United States Census Bureau reported the 2020 census results to Alaska. The Board then had until September 11 to "adopt one or more proposed redistricting plans" for public hearings and until November 10 to adopt a final plan.[91] The Board held meetings and took public testimony August 23-24 and September 7-9. On September 9 — within the required 30-day period — the Board adopted two proposed redistricting plans with 40 House districts, but no Senate district

---

[91] Alaska Const. art. VI, § 10(a) (requiring Board to adopt one or more proposed redistricting plans within 30 days of receiving official census information; to hold public hearings; and to adopt final plan within 90 days).

pairings.  On September 20 — after the initial 30-day period — the Board adopted updated versions of the first two plans, as well as four third-party plans.  The Board then took the six adopted plans on a "road show" from September 27 to November 1, holding public hearings throughout Alaska.  These hearings included some testimony about possible Senate district pairings.

The Board reconvened in Anchorage November 2-5.  On November 5 the Board voted 4-1 (with Member Marcum disagreeing) to approve the final House redistricting map.  On November 8 the Board began working on Senate district pairings, and took two hours of public testimony.  On November 9 the Board exited an executive session and without meaningful discussion immediately adopted, by a 3-2 vote with Board Members Bahnke and Borromeo disagreeing, a number of Senate pairings, including pairing House Districts 21 and 22 to create Senate District K.  On November 10 the Board adopted its final state-wide redistricting plan; Board Members Binkley, Marcum, and Simpson signed in support and Board Members Bahnke and Borromeo signed in opposition.

B.    **Superior Court Proceedings**

Five separate challenges to the Board's plan were filed in superior court and consolidated into one case.  The challengers included:  (1) Matanuska-Susitna Borough (Mat-Su Borough) and voter Michael Brown (collectively Mat-Su); (2) City of Valdez and voter Mark Detter (collectively Valdez); (3) Municipality of Skagway Borough and voter Brad Ryan (collectively Skagway); (4) East Anchorage voters Felisa Wilson, George Martinez, and Yarrow Silvers (collectively East Anchorage); and (5) Calista Corporation, William Naneng, and Harley Sundown (collectively Calista).  The superior court also heard from several intervenors:  Doyon, Limited; Tanana Chiefs Conference; Fairbanks Native Association; Ahtna, Inc.; Sealaska Corporation; Donald Charlie, Sr.; Rhonda Pitka; Cherise Beatus; and Gordon Carlson.  Participating jointly as amici curiae

were Alaska Black Caucus; National Association for the Advancement of Colored People Anchorage, Alaska Branch #1000; Enlaces; Korean American Community of Anchorage, Inc.; Native Movement; and First Alaskans Institute. We refer to this group as "amici curiae Alaska Black Caucus."

The superior court conducted a 12-day bench trial starting January 21, 2022. Pretrial proceedings took place on a highly condensed schedule: The parties took depositions of Board members and other witnesses and filed direct testimony by depositions and affidavits in advance of trial. Cross-examination and redirect testimony were permitted at the trial.

The superior court issued its decision on February 15, making the following legal conclusions and remanding to the Board to remedy deficiencies in the final plan:

1. The Board violated the rights of the East Anchorage Plaintiffs under the Equal Protection Clause of the Alaska Constitution . . . by pairing House District 21-South Muldoon with the geographically and demographically distinct House District 22-Eagle River Valley to create Senate District K.

2. The Board violated the rights of the East Anchorage and Skagway Plaintiffs under the Due [Process] Clause of the Alaska Constitution . . . by failing to take a "hard look" at House District 3 and Senate District K in light of the clear weight of public testimony.

3. The Board violated Article VI, Section 10 by failing to hold meaningful public hearings on proposed Senate Districts prior to adoption.

4. The Board violated Article VI, Section 10 by failing to include Senate District pairings in any proposed plan adopted before the 30-day constitutional deadline.

5. The Board violated Article VI, Section 10 by failing to make a good-faith effort to accommodate public testimony in regard to House District 3 and Senate

District K.

6. The Board violated the Open Meetings Act . . . in its improper use of executive session, but the violation does not, on balance, require the Court to void all actions taken by the Board in executive sessions.

7. In all other respects, the Board did not violate the Plaintiffs' rights under Article I, Sections 1 and 7, or Article VI, Sections 6 and 10.

This matter should be remanded to the Board to address the deficiencies in the Board plan consistent with this order.

## C. Petitions For Review

The Board, Skagway, Mat-Su, and Valdez petitioned for our review of portions of the superior court's decision.[92] We granted review, later issuing a summary order resolving the petitions and noting that a full explanation would follow.[93]

### 1. The Board's petition

The Board's petition focuses on East Anchorage's successful challenge to Senate District K and on Skagway's successful challenge to House Districts 3 and 4. The Board contends that its mapping of House Districts 3 and 4 and Senate District K did not violate article VI, section 10 and that the superior court's textual interpretation of section 10 and reasoning by analogy to federal administrative procedures law were erroneous. The Board adds that Senate District K did not discriminate against distinct communities of interest in East Anchorage and thus did not violate the right to fair representation under Alaska's equal protection law. The Board further argues that it did

---

[92] *See* Alaska R. App. P. 216.5(h) (providing for immediate petition for review to supreme court of superior court decision remanding to Board).

[93] We attach as Appendix A copies of relevant election district maps the Board published with its November 2021 redistricting proclamation. Our earlier summary order resolving the petitions for review is attached as Appendix B.

not violate the Open Meetings Act; that, even if it did, a waiver of attorney-client privilege is not an appropriate remedy for violations of the Act; and that the superior court erred in its handling of the Board's discovery requests and proposed witness testimony.

### 2. Skagway's petition

Skagway contends that, although the superior court correctly invalidated House Districts 3 and 4 on due process grounds, the court also should have invalidated the districts for violating article VI, section 6's socioeconomic integration requirement. Skagway also contends the superior court erred by concluding that the Board followed the *Hickel* process and by not addressing Skagway's equal protection argument.

### 3. Mat-Su's and Valdez's petitions

Mat-Su and Valdez primarily challenge the superior court's determinations that House Districts 29 and 36 satisfy Alaska's constitutional requirements. They contend that the superior court erred when it concluded the Board had followed the *Hickel* process, the Board's Open Meeting Act violations did not justify voiding any action taken, and the Board gave salient issues a "hard look" when creating the House district combining portions of the Mat-Su Borough and the Valdez area.

## IV. RESOLUTION OF ROUND 1 PETITIONS FOR REVIEW

### A. Common Issues

#### 1. The superior court did not err when it concluded that the Board sufficiently followed the *Hickel* Process.

Not long after receiving the 2020 census data in mid-August 2021 the Board held a mapping work session, and the members learned that the mapping software could display race data. Although Board members clearly were interested in how race data changed based on district boundary lines, they made comments reflecting an understanding that race data and VRA requirements should not be considered until later

in the process. At this work session Member Bahnke drew what would become House Districts 37, 38, 39, and 40, covering much of Alaska; as she drew the districts, she nonetheless asked about certain race data.

On September 8 the Board orally affirmed that it would proceed without the race data being visible on the districting software. On September 9 the Board adopted two proposed redistricting plans, "Board Composite v.1" and "Board Composite v.2." Member Bahnke requested that the Board engage with its VRA expert "as soon as practicable" after adopting the proposed plans, "at least to look at what [has been] developed." House Districts 37, 38, 39, and 40 — referred to as early as November 2 as the "VRA Districts" by the Board — did not significantly change between September 9 and the final redistricting plan adopted in November.

From September 17 to 20 the Board took public testimony, replaced Composites v.1 and v.2 with Composites v.3 and v.4, and adopted four third-party plans for consideration. It then embarked on its public hearing road show from September 27 to November 1. After the road show the Board received a VRA compliance report. The report found that Districts 37, 38, 39, and 40 complied with the VRA. It also noted that because three of these four districts "experienced population growth which outpaced increases in the overall state population," the Board was able "to draw compact, contiguous districts which retain[ed] existing socio-economic integration while retaining core constituencies." The Board then adopted the final House districts map on November 5.

At trial challengers contended that the Board "locked in" Districts 37, 38, 39, and 40 as "VRA Districts" at an early stage of the process, violating the *Hickel* process. They argued that, having done so without entertaining modifications, the Valdez area was paired with portions of the Mat-Su Borough because the Board no longer had anywhere else to put the Valdez area.

The superior court found:

> The transcripts and videos of public Board meetings make it abundantly clear that Board Members were actively considering VRA-related issues since the beginning of the process. And the fact that all four of the Board's proposed plans contained identical versions of Districts 37, 38, 39, and 40 also creates a strong inference that the Board never truly considered available alternatives.

The superior court particularly noted that there were "very few changes to the so-called VRA districts throughout the entire process"; that "the Board [was] made aware of past VRA districts and requirements"; that "it was capable of viewing and had racial data displayed during several public work sessions in August and September"; that Member Bankhe made comments "throughout the redistricting process evidenc[ing] a strong preoccupation with both VRA requirements and the percentage of Alaska Natives in rural areas"; and that "by early September, the Board was requesting its VRA consultants to analyze the proposed plans 'as soon as practicable.'"

Despite these findings the superior court ultimately determined that the Board sufficiently followed the *Hickel* process, and the court declined to grant relief on the basis of any deviations. The court discussed how the Board clearly would have violated the *Hickel* process if it meant "that the Board can never consider VRA implications prior to adoption of the final house plan." But the court ultimately interpreted *Hickel* and our subsequent case law to mean that the Board may take "VRA requirements into account during the final stretch of the redistricting process" and that the Board sufficiently complied with the *Hickel* process.

Mat-Su, Skagway, and Valdez contend the superior court erred when it determined that the Board sufficiently followed the *Hickel* process. The Board responds that it completed "all of its proposed plans without analyzing or applying the VRA, or even considering racial data . . . until the proposed plans were set." Disputing the

assertion that "VRA Districts" were locked in, the Board points to the superior court's observation that House Districts 37, 38, and 39 were modified up until the last day.

Whether the Board violated the *Hickel* process is much less obvious in the matters now before us compared with *Hickel* or the 2011 redistricting cases. The Board clearly was aware of race data at the start, but we agree with the superior court that this seemed to be a part of learning "the basics of the redistricting process and how to use the districting software." Referring to these districts as "VRA districts" early in the process also seems reasonable given their historic consideration under the VRA,[94] and it would not necessarily mean that these districts were drawn with the VRA in mind during the redistricting process. We agree with the superior court that, given *Hickel*'s avoidance of the constitutional language of "proposed" and "final" plans, the Board is not required to save VRA considerations until the very end of the 90-day period for adopting a final redistricting plan.[95] Designing a proposed plan without specific attempts to meet VRA requirements and then submitting it to VRA experts, regardless of where the Board is in its timeline for adopting a final plan, satisfies the *Hickel* process.

We thus affirm the superior court's conclusion that the Board sufficiently complied with the *Hickel* process.

### 2. The superior court did not err by concluding that it was not in the public's best interest to vacate Board actions resulting from Open Meetings Act violations.

Many times throughout its work the Board met in executive session under

---

[94]     *See 2011 Redistricting III*, 294 P.3d 1032, 1035-36 (Alaska 2012) (identifying 2011 VRA regions that are similar to those identified in 2021).

[95]     *See Hickel v. Se. Conf.*, 846 P.2d 38, 51 n.22 (Alaska 1992).

the Open Meetings Act (OMA),[96] and the Board's executive sessions were a significant issue at trial. The executive sessions were particularly problematic because they hindered the superior court's ability to review the Board's actions.

Toward the end of the Board's November 3 meeting, the members discussed the Valdez area's House district placement. The Board appears to have been deciding between pairing the Valdez area with portions of the Mat-Su Borough or with some Prince William Sound communities. Several members opined that an executive session might be necessary to discuss legal issues about pairing the Valdez area with portions of the Mat-Su Borough. The Board took a short break; immediately upon return Member Simpson moved to enter into executive session "under AS 44.62.310(c), subsections (3) and (4)," without further specification.[97] The executive session lasted

---

[96]    The OMA, instructing governmental bodies to make meetings open to the public, applies to "[a]ll meetings of a governmental body of a public entity of the state." AS 44.62.310(a).   The OMA is meant to maintain open deliberations, prevent governmental agencies from deciding "what is good for the people to know and what is not good for them to know," and protect "the people's right to remain informed . . . so that they may retain control over the instruments they have created." AS 44.62.312. Consideration of matters required by law to be kept confidential or matters "not subject to public disclosure" need not be open to the public and can instead be "discussed at a meeting in executive session." AS 44.62.310(b), (c)(3), (c)(4). The OMA's remedy for executive sessions held contrary to the statutory terms is that, subject to a lawsuit, the hidden action is voidable but can be cured by "conducting a substantial and public reconsideration of the matters considered at the original meeting." AS 44.62.310(f).

[97]    *Cf.* AS 44.62.310(b) ("The motion to convene in executive session must clearly and with specificity describe the subject of the proposed executive session without defeating the purpose of addressing the subject in private. Subjects may not be considered at the executive session except those mentioned in the motion calling for the executive session unless auxiliary to the main question."). As the superior court noted, vague motions to enter into executive session hinder the ability to determine "whether a particular executive session was held in accordance with the law." We are unable to

(continued...)

through the end of the day's meeting. That evening Member Borromeo sent text messages to two individuals asking for case law supporting a pairing of the Valdez area and portions of the Mat-Su Borough.

November 4 was a full-day mapping work session. The Board reviewed a map pairing the Valdez area with portions of the Mat-Su Borough. Board members discussed that the pairing was socioeconomically integrated and compact and that the Board's legal counsel had advised them there was historical precedent for the pairing. There was no further discussion of pairing the Valdez area with Prince William Sound communities. When Member Marcum suggested that the Board reconsider, Member Borromeo explained that three Board members were not willing to place the Valdez area in "the Interior" House district and that the Anchorage area apparently was not a viable pairing option due to other constitutional concerns. The Board eventually agreed that Member Marcum could propose pairing the Valdez area and the Anchorage area.

On November 5 the Board entered into executive session twice. After Member Simpson mentioned "a Voting Rights issue" he moved to enter into executive session "for the purpose of receiving legal advice . . . under AS 44.62.310, involving matters which by law or ordinance are required to be confidential, and matters involving consideration of government records that by law are not subject to public disclosure."[98] The Board returned from executive session and entered a mapping work session. Member Marcum mentioned that, despite public testimony demonstrating Valdez area

---

[97]     (...continued)
discern how these allowances for executive session applied to the Board's discussion about pairing the Valdez area with portions of the Mat-Su Borough.

[98]     We are unable to discern how these allowances for executive session applied to the Board's discussion about pairing the Valdez area with portions of the Mat-Su Borough.

voters and Mat-Su Borough voters did not want to be paired together, after consulting with legal counsel the pairing appeared to be the only available option. Following more public testimony, Member Bahnke suggested that the Board enter into executive session for legal advice on the "whole new map that [was] on the table for consideration." Member Borromeo moved to enter into executive session under AS 44.62.310(c)(3) and (4), again without offering an explanation beyond the statutory language;[99] the motion passed. When the Board exited executive session it appeared to have narrowed its choices to two maps, both pairing the Valdez area with portions of the Mat-Su Borough. The Board ultimately voted and approved a final House district map with that pairing.

On November 8, when the Board began work on Senate district pairings, it took two hours of public testimony before entering into executive session. This was the only public testimony taken specifically for Senate district pairings, and residents from both Anchorage and Eagle River tended to support pairing the North and South Muldoon House districts together and the North and South Eagle River House districts together. The Board entered into executive session to "speak with [its] legal counsel and voting rights consultant" upon a motion by Member Borromeo citing "legal and other . . . purposes relating to receiving legal counsel."[100]

After the executive session ended, the Board conducted a work session for over three hours. During the work session Member Bahnke "strongly" recommended pairing the Eagle River House districts together, but Member Marcum stated there was a "socioeconomic connection between [Joint Base Elmendorf - Richardson (JBER)] and

---

[99] We are unable to discern how these allowances for executive session applied to the Board's discussion about pairing the Valdez area with portions of the Mat-Su Borough.

[100] We are unable to discern how this topic fit within the statutory allowances for executive session.

[North] Eagle River" and said their two House districts should be paired together. The Board ended the day with an executive session, apparently seeking legal advice on the Senate district pairings.[101]

When the Board reconvened on November 9 it continued in executive session. The Board then resumed public session, and without any substantive discussion on the record, Member Marcum moved that the Board combine the South Eagle River House district with the South Muldoon House district to make up Senate District K. Members Binkley, Marcum, and Simpson voted in favor, with Members Bahnke and Borromeo opposed.

The propriety of the Board's various executive sessions first came before us in January 2022 after challengers asked the superior court to conduct a private review of certain Board communications, contending that "the Board [had] improperly utilized executive sessions to conduct what should have been public deliberations." The superior court found that the challengers had a reasonable basis to believe that in camera review[102] may show that some of the documents might not be subject to the attorney-client

---

[101]    We are unable to discern how this topic fit within the statutory allowances for executive session.

[102]    When a party asserts that a requested document or communication is privileged, the superior court may privately review evidence "to determine the applicability of the" asserted privilege only upon " 'a showing of a factual basis adequate to support a good faith belief by a reasonable person,' . . . that in camera review of the materials may reveal evidence to establish" whether the asserted privilege applies. *Cent. Constr. Co. v. Home Indem. Co.*, 794 P.2d 595, 598-99 (Alaska 1990) (omission in original) (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989)).

privilege[103] due to the interplay of the OMA, the Public Records Act[104] and the appearance of the Board utilizing executive sessions to obtain general redistricting legal advice rather than specific litigation advice. Shortly before trial began, the superior court ordered a private review of some documents the Board had claimed were privileged.

The Board filed an emergency petition for review, asking us to decide that the order for in camera review would violate its privilege rights and that the OMA neither applies to the Board nor provides for in camera review of otherwise privileged documents as a remedy for violation. We denied the petition for review. Although the superior court ultimately determined that most of the documents were privileged, it ordered a few "be produced over the Board's objection." The superior court explained in its February 15 decision that it would have ordered production of additional documents regarding whether "discussions held during executive session" violated the OMA but that the violations did not appear to be in bad faith and the current state of the law made it unclear whether doing so was an available remedy.

In its February 15 decision the superior court additionally determined that the Board likely violated the OMA when "at least three Board members reached a 'consensus' outside of the public view" regarding Senate District K.[105] But because the

---

[103]     *See* Alaska R. Evid. 503 (establishing scope of lawyer-client privilege).

[104]     *See* AS 40.25.120 (affording right to every person "to inspect a public record in the state" subject to specific exceptions).

[105]     The court found the Board also violated procedural requirements under the OMA when the Board convened executive sessions "following a vague motion which did not specify the meeting's subject." Although stating that these violations "harm[] the public confidence in public entities generally and more importantly in the highly visible and consequential redistricting process," the superior court concluded that they did not, on balance, "outweigh the harm that would be caused were [it] to void the Senate
(continued...)

Board publicly voted to adopt Senate District K, the court concluded that it was not a voidable action. The court noted that it had struggled to discern the extent to which the Board conducted executive session for inappropriate reasons. The court also suggested that an "appropriate remedy for violation of the OMA would include opening the door to discussions held during executive session, regardless of the presence of an attorney" in light of the "strong public policy in favor of open government."

### a.      The Board's OMA arguments

The Board challenges the superior court's determination that the Board engaged in "secret deliberations on senate pairings" and the superior court's suggestion that improperly entering into executive sessions might waive the attorney-client privilege. Unlike the Board's position in the superior court, the Board does not now assert that it is exempt from the OMA.[106]  Because the superior court did not invalidate

---

[105]      (...continued)
pairings on that basis alone."

[106]      The OMA's plain language seems to support the superior court's conclusion that the OMA applies to the Board. Subject to certain exceptions not relevant here, the OMA applies to "[a]ll meetings of a governmental body of a public entity of the state," and "governmental body" is defined broadly to mean: "[A]n assembly, council, board, commission, committee, or other similar body of a public entity with the authority to establish policies or make decisions for the public entity." AS 44.62.310(a), (h)(1). Prior to the 1999 constitutional amendments creating the independent redistricting board, we held that the governor's advisory board was subject to the OMA. *See Hickel v. Se. Conf.*, 846 P.2d 38, 57 (Alaska 1992). And in *2001 Redistricting I* we reviewed the Board's alleged OMA violations without reconsidering whether it still applied in light of the 1999 amendments changing Board appointment procedure. 44 P.3d 141, 147 (Alaska 2002). The OMA is unenforceable against the legislative and judicial branches of government. *See Abood v. League of Women Voters*, 743 P.2d 333, 337-40 (Alaska 1987) (holding that whether OMA applied to legislature was nonjusticiable issue because "[t]he Alaska Constitution expressly commits to the legislature authority to adopt its own rules of procedure" and that whether to conduct business "in open or closed sessions is
(continued...)

Senate District K due to OMA violations and because we view the alleged abuse of executive session as more pertinent to the superior court's blended due process and "hard look" analysis we address later, we focus solely on the superior court's suggested remedy that OMA violations might act to waive the Board's attorney-client privilege in some situations. We address this issue because of the Board's continuing work.

The Board contends that the only remedy for an OMA violation is voiding the action wrongfully taken in executive session, not "abrogat[ing] the government's attorney-client privilege." We agree with the Board that the only remedy for an action taken during an OMA violation is voiding the action, "if the court finds that, considering all of the circumstances, the public interest in compliance with [the OMA] outweighs the harm that would be caused to the public interest and to the public entity by voiding the action."[107] But we also recognize that the OMA reflects a body of law distinct from the law of privilege[108] and that matters discussed during an executive session are not automatically privileged merely because an attorney for the governing body is present

---

[106]    (...continued)
a procedural question . . . traditionally . . . the subject of legislative rules"). But there is no express constitutional reservation of authority to the Board to promulgate its own procedural rules, and the Board thus is subject to Alaska Statutes that do not interfere with its constitutionally granted powers. *Compare* Alaska Const. art. II, § 12, *and* art. IV, §§ 8, 15, *with* art. VI, § 9 (expressly reserving rule-making powers to the legislature, judiciary, and judicial council, but not to the Board).

[107]    AS 44.62.310(f).

[108]    Generally, "[c]ourts consistently 'find no language in the [OMA] that would support the assertion that the Legislature intended to create an absolute privilege for all communications occurring while a public body is in a closed session.' " ANN TAYLOR SCHWING, OPEN MEETING LAWS § 7.11 F. (3d ed. 2011) (quoting *State ex rel. Upper Republican Nat. Res. Dist. v. Honorable Dist. Judges*, 728 N.W.2d 275, 279 (Neb. 2007)).

for the discussions.  There are limits on using the OMA's executive session provisions for legal advice pertaining to the business of a government agency.[109]  But we do not need to explore those limits at this time.

### b.    Mat-Su's OMA arguments

Mat-Su contends that the superior court failed to address a potential OMA violation raised by Mat-Su at trial and that the court erred when it failed to void Board actions after the Board violated the OMA.  At trial Mat-Su raised the question whether the Board violated the OMA by improperly entering into executive session on November 3 and deciding to place the Valdez area with portions of the Mat-Su Borough in House District 29.  Mat-Su asserted that the Board improperly discussed the placements "outside the view of the public eye" and that, in combination with some other "very egregious actions" by the Board, it warranted remanding the entire final plan for reconsideration.

Mat-Su is correct that the superior court's February 15 decision overlooked Mat-Su's challenge to the November 3 executive session, and we therefore give it our independent review.[110]  Mat-Su argues that, procedurally, the Board's motions to enter

---

[109]    *See Cool Homes, Inc. v. Fairbanks North Star Borough*, 860 P.2d 1248, 1262 (Alaska 1993) ("It is not enough that the public body be involved in litigation. Rather, the rationale for the confidentiality of the specific communication at issue must be one which the confidentiality doctrine seeks to protect:  candid discussion of the facts and litigation strategies.").  We recognize that our case law addressing the intersection of statutory or constitutional public hearings requirements and privileged communication has room for development.  *Cf. Detroit News, Inc. v. Indep. Citizens Redistricting Comm'n*, 976 N.W.2d 612, 628-29 (Mich. 2021) (holding privilege did not attach to recording and materials stemming from improperly held closed-session meeting discussing work within Redistricting Commission's core business in light of constitutional mandate for open meetings).

[110]    *See* Alaska Const. art. VI, § 11 ("On appeal from the superior court, the

(continued...)

into executive sessions were not sufficiently specific. Mat-Su argues that substantively the Board violated the OMA because: it started discussing placing the Valdez area with Prince William Sound communities on November 3; it entered into an executive session that lasted until the end of the day; Member Borromeo sent texts to two individuals asking for case law permitting the Valdez area to be paired with portions of the Mat-Su Borough;[111] and when the Board returned to open session on November 4, a majority of the members seemed to be in agreement that the Valdez area and portions of the Mat-Su Borough could be paired together, but the Board had "never engage[d] in a mapping session of the [Valdez area] with the Prince William Sound communities" despite Member Marcum continuing to state that other combinations might be more compact, contiguous, and socioeconomically integrated. Mat-Su contends that, taken together, these facts demonstrate the Board improperly deliberated outside the public eye about placing the Valdez area.

The Board responds by pointing to parts of the November 4 public proceedings when members were discussing the Valdez area. The Board also asserts that the public interest would not be served by voiding its final plan because of any procedural mistakes it made when calling executive sessions.

We agree with Mat-Su that on November 3, 4, and 5 the Board entered into executive sessions without clearly and specifically describing the subject of the proposed

---

[110]     (...continued)
cause shall be reviewed by the supreme court on the law and the facts.").

[111]     Mat-Su argues, without citing authority, that these text messages during executive session violated the OMA, but the statutory language has no prohibition against such communications. We do not further address this issue.

session as required by law.[112] Instead of merely reciting the statutory language explaining broad subject categories that may be considered in executive session, the Board should have been more specific about the matters to be discussed, though not to the extent of defeating "the purpose of addressing the subject in private."[113] The Board's actions appear suspect, defeat the public's ability to witness deliberations, and cause courts to struggle in reviewing the constitutionality of the Board's actions. But despite likely inappropriate uses of executive session, the Board's public discussions about where to place the Valdez area are sufficient for appellate review and allow us to determine whether the Board gave the issue a hard look. Under the circumstances — particularly given the compressed timeline for the Board's work and redistricting's importance to all Alaskans — the superior court did not err by concluding that it would not be in the public interest to void the Board's entire final plan due to some OMA violations.[114]

### 3. Making the traditional hard look analysis more restrictive by blending it with other constitutional concerns was error.

A court's review of a redistricting plan is similar to its review of "a regulation adopted under a delegation of authority from the legislature to an administrative agency to formulate policy and promulgate regulations[:] . . . . first to

---

[112] *See* AS 44.62.310(b) (requiring that motion for executive session "must clearly and with specificity describe the subject" to be discussed).

[113] *Id.*

[114] *See* AS 44.62.310(f) ("A court may hold that an action taken at a meeting held in violation of this section is void only if the court finds that, considering all of the circumstances, the public interest in compliance with this section outweighs the harm that would be caused to the public interest and to the public entity by voiding the action."). However, if in future redistricting efforts the Board appears to abuse executive sessions, injunctive relief under Alaska Civil Rule 65(a) or (b) may be warranted.

insure that the agency has not exceeded the power delegated to it, and second to determine whether the regulation is reasonable and not arbitrary."[115]  The superior court conducted a "first impression" analysis to determine "the legal standards by which the concept of 'unreasonableness' should be measured" for the Board's redistricting plan. After reviewing Constitutional Convention minutes, legislative history from the 1999 amendments to article VI, and federal statutes and case law, the superior court concluded:

> [T]he spirit of [a]rticle VI, [s]ection 10 . . . compels the Board to present the public with a number of equally constitutional redistricting plans and then let the people have a say about which plan they prefer.  While the Board need not respond to every single comment received, the Board must make a good-faith effort to consider and incorporate the clear weight of public comment, unless state or federal law requires otherwise. . . . [T]he Board must give some deference to the public's judgment.  If the Board adopts a final plan contrary to the preponderance of public testimony, it must state on the record legitimate reasons for its decision. (Footnote omitted.)

This appears to be the standard the superior court used for its blended "hard look" and due process analysis.[116]

---

[115]  *Groh v. Egan*, 526 P.2d 863, 866 (Alaska 1974); *see also 2011 Redistricting III*, 294 P.3d 1032, 1037 (Alaska 2012).

[116]  The superior court adopted this blended approach based on our traditional hard look requirement and constitutional procedural and substantive due process requirements, as well as the public hearings requirement under article VI, section 10. Although before us there were challenges to the court's overall "hard look" test, they did not detail the extent to which substantive due process concerns might apply.  We accordingly do not parse the applicability of substantive due process to the "hard look" analysis. *See Balough v. Fairbanks North Star Borough*, 995 P.2d 245, 263 (Alaska 2000) (describing heavy burden on party asserting substantive due process violation "for if any conceivable legitimate public policy for the [state action] is apparent on its face
(continued...)

The superior court then concluded that the Board gave a hard look to House District 29's combination of the Valdez area with portions of the Mat-Su Borough, noting that the Board had "carefully considered the available options[,] . . . acted reasonably," and "certainly did not ignore public testimony." Regarding Senate District K, however, the court concluded that "the Board obviously violated the 'hard look' standard by ignoring public comment on the senate pairings," apparently "to accommodate the wishes of a single Member." The court similarly concluded that the Board "failed to take a hard look at [House] Districts 3 and 4" because it did not "make a good-faith attempt to incorporate the public testimony." The Board, Mat-Su, and Valdez challenge aspects of the superior court's hard look analysis.

### a. Our view of the superior court's hard look analysis

Rather than requiring the Board to "make a good-faith effort to consider and incorporate the clear weight of public comment" or "give some deference to the public's judgment," the hard look analysis has more nuance. A redistricting plan is reasonable if "the [Board] has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making."[117] If public comments introduce a "salient problem," such as a defect under article VI, section 6, it would be unreasonable to ignore the problem when drawing district boundaries; absent some evidence explaining the Board's action and how it took the problem into account, a court could conclude that the Board failed to take a hard look. But if public comments merely reflect

---

[116] (...continued)
or is offered by those defending the [action], the opponents of the [action] must disprove the factual basis for such a justification" (quoting *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974))). If relevant in future redistricting litigation, parties should more robustly address this concept.

[117] *2001 Redistricting I*, 44 P.3d 141, 143 n.5 (Alaska 2002) (quoting *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001)).

preferences for district boundaries without implicating substantive redistricting requirements, drawing district boundaries based on demonstrated substantive redistricting requirements and not the "weight of public comment" likely would not violate the hard look requirement. We nonetheless note that a Board's failure to follow a clear majority preference between two otherwise equally constitutional legislative districts under article VI, section 6 may be evidence supporting a gerrymandering claim.

### b.    The Board's arguments

The Board contends that the superior court's erroneous hard look analysis caused the court to err when it invalidated House Districts 3 and 4 and Senate District K. Because the court invalidated Senate District K on grounds beyond the hard look analysis — specifically for unconstitutional political gerrymandering, a ruling which we affirm below — we do not address the Board's argument on this point. But the court ruled that House Districts 3 and 4 were unconstitutional based solely on its "weight of public testimony" approach to the hard look analysis. Because the court otherwise agreed substantive redistricting requirements were satisfied and no salient problems were raised that the Board failed to consider, we reverse the court's invalidation of House Districts 3 and 4 and its accompanying remand to the Board.

### c.    Mat-Su's and Valdez's arguments

Mat-Su contends that in light of the superior court's approach to the hard look requirement, "the court erred when it found that the Board took a 'hard look' at testimony offered by Valdez and [Mat-Su]" regarding House District 29. Because Mat-Su's assertion relies entirely on the misguided standard for the hard look analysis without pointing to any discrete salient problems (beyond the weight of public preference) that the Board did not consider, we reject its argument and turn to Valdez's arguments about the Board's creation of House Districts 29 and 36.

Valdez first argues that the Board did not engage in reasoned decision-

making about forming District 29 because the Board "spent minimal time analyzing how to accommodate the strong public testimony against pairing [the Valdez area] and [portions of the Mat-Su Borough] together in a district." Again, this argument alone is insufficient to invalidate House District 29 without the public comments having raised some salient problem that the Board failed to address.

Valdez also argues that it is evident the Board did not give House District 29 a hard look because (1) "District 29 in the Final Plan is virtually unchanged from Member Borromeo's proposed plan, . . . which was developed prior to the Board's public hearing tour with minimal involvement of other Board members," and (2) what turned out to be the final plan "was adopted outside of the constitutionally mandated [30-day] deadline for adopting proposed plans set forth in article VI, section 10" and was "an entirely new 40[-]district plan with radically different districts than those" of the original version it replaced. But a proposed election district's evolution over the course of redistricting, without more, lends little insight into whether the Board gave it a hard look, and the superior court discussed this factor when rejecting the argument that the Board violated the *Hickel* process. And Valdez presents no legal support for its argument that adopting a final redistricting plan developed after the first 30 days of the redistricting process is unconstitutional; such a position would make the constitutional public hearing requirement virtually meaningless.

Valdez also appears to argue that the Board impermissibly "constrained the range of redistricting options it considered based upon the mistaken legal premise that the [Fairbanks North Star Borough (FNSB)] could not be included in more than one district that included population from outside of FNSB." Valdez asserts that "[t]he [superior] court erred in holding that the Board properly viewed any redistricting alternative that placed population from FNSB in more than one district [with population from outside FNSB] as not viable." The Board responds that *Hickel* instructs, when

possible, to "include all of a borough's excess population in one other district"[118] and that "*2001 Redistricting* [*I*] does not suggest otherwise."[119] We conclude, given that the Board was able to keep FNSB's excess population together in one House district while abiding by other constitutional requirements, the Board did not act arbitrarily or unreasonably by doing so without considering additional plans that would split FNSB's excess population between multiple House districts.

Valdez's remaining hard look arguments about District 29 focus on the Valdez area being more socioeconomically integrated with communities other than those in the Mat-Su Borough and the Board making only passing mention of the other article VI, section 6 requirements. But, as we note throughout this opinion, the Constitution does not require the most possible socioeconomic integration, particularly if other constitutional requirements may be compromised.[120] The superior court described Board-identified socioeconomic connections between the Valdez area and the Mat-Su Borough, and we agree with the superior court that the described socioeconomic integration level satisfied section 6's "relatively integrated socio-economic area"

---

[118]  *See* 846 P.2d 38, 52 (Alaska 1992) ("This result is compelled not only by the article VI, section 6 requirements, but also by the state equal protection clause which guarantees the right to proportional geographic representation.").

[119]  *See* 44 P.3d at 144 (instructing that Board may combine excess populations from adjoining boroughs).

[120]  *See Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1362-63 (Alaska 1987) (discussing socioeconomic integration under sufficiency standard); *see also Hickel*, 846 P.2d at 45 n.10 (explaining that socioeconomic integration requirement is more flexible than contiguity and compactness requirements such that degree of integration can be reduced if necessary "to maximize the other constitutional requirements of contiguity and compactness").

requirement.[121] The court's February 15 decision discussed the Board's impressive steps when drawing the Valdez area House district boundaries, and we affirm the court's conclusion that — for the hard look analysis — the Board acted reasonably in making ultimately unsuccessful efforts to keep the Valdez and Mat-Su Borough areas in separate House districts.

Valdez relatedly argues that the Board improperly neglected constitutional redistricting criteria while prioritizing individual Board member goals.[122] Valdez first asserts that certain Board members were too deferential to the "Doyon Coalition's goal of keeping Interior Doyon and Ahtna villages together in one District" at the expense of putting the Valdez area with portions of the Mat-Su Borough. Valdez next asserts that "the Board openly sought to maximize the percentage of Native voters in District 36," constituting gerrymandering and warranting remand of the final plan. Valdez also argues that Member Binkley prioritized "protecting the borough boundaries of FNSB," impermissibly foreclosing "consideration of numerous viable redistricting options including districting [the Valdez area] with Richardson Highway communities and the FNSB." Valdez finally argues that the Board improperly relied on "ANCSA boundaries[123] to support the creation of District 36 and justify keeping Bering Straits

---

[121] Alaska Const. art. VI, § 6; *see Hickel*, 846 P.2d at 46-47 (describing comparable scenarios satisfying socioeconomic integration requirement).

[122] Valdez raises similar arguments when challenging Districts 29 and 36 as not complying with article VI, section 6 requirements. Valdez couches these arguments under the *Hickel* requirement that the Board "is not permitted to diminish the degree of socio-economic integration in order to achieve other policy goals," *see* 846 P.2d at 45 n.10, but because Valdez seems also to challenge the Board's hard look requirement, we discuss it here.

[123] "ANCSA boundaries" refers to the Alaska Native Claims Settlement Act
(continued...)

communities separate from Doyon communities," warranting remand because it created "District 29, which is not socio-economically integrated, and District 36, which is neither socio-economically integrated nor compact."

The first three arguments quickly can be dispensed with for similar reasons. We agree with the superior court that the "practice of assigning each [Board] Member a region and ultimately deferring to those [m]embers' judgment on their assigned regions" is somewhat troubling. But it is not necessarily improper to consider a Board member's personal regional experiences if constitutional requirements are met, and the line between excessive deference to and independent agreement with a Board member is difficult to monitor. As discussed earlier, we also agree with the superior court that the Board did not violate the *Hickel* process, and thus any alleged premature VRA considerations likely did not interfere with the Board taking a hard look at the issues Valdez raised. Despite Valdez seemingly indicating otherwise, the hard look analysis does not require that the Board consider every possible permutation of statewide House districts.[124] The expedited nature of the redistricting process also means that when changes are made toward the end of the process — an appropriate result almost

---

[123]     (...continued)
of 1971. *See generally* 43 U.S.C. §§ 1601-1629h. "Under that Act, the state was divided into 12 regions, and separate corporations were established for each region. By the division it was sought to establish homogeneous groupings of Native peoples having a common heritage and sharing common interests." *Groh v. Egan*, 526 P.2d 863, 877 (Alaska 1974) (footnote omitted).

[124]     *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) ("It is true that a rulemaking 'cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man . . . regardless of how uncommon or unknown that alternative may have been . . . .' " (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978))).

inevitably happening after public hearings — the Board cannot be expected to reconsider every subsequently possible permutation in light of new boundaries. Finally, we note the zero-sum nature of redistricting: accepting Valdez's proposed House district in turn would have affected House districts throughout interior Alaska; municipalities and voters in the affected areas likely would have raised the same arguments Valdez raises, suggesting that the Board was biased in favor of the Valdez area and that adopting Valdez's proposed House district "locked in" unfavorable House districts in Alaska's interior region.

Valdez's fourth argument — that the Board improperly relied upon ANCSA boundaries for House District 36 — challenges the superior court's assertion that "ANCSA regions are indicative of socio-economic integration and may be used to guide redistricting decisions, and they may even justify some degree of population deviation." Valdez argues that because the "purpose of ANCSA was to form 'homogeneous grouping' of Alaska Natives in 1970," ANCSA does not reflect the present-day Alaskan populations nor "the article VI, section 6 constitutional standards for contiguity, compactness, or socio-economic integration." Valdez then points to various statistics tending to show that "ANCSA boundaries do not provide evidence of socio-economic integration among non-Native populations." Finally, Valdez argues that, to the extent ANCSA boundaries are relevant to drawing districts, the relevance is limited only to justifying a population deviation greater than ten percent.

Valdez is correct that we previously have discussed using ANCSA boundaries in redistricting only as a justification for "a population deviation greater than 10 percent."[125] But in the present case evidence about ANCSA boundaries was tied to socioeconomic integration. For example, there was testimony that Doyon region villages

---

[125] *Hickel*, 846 P.2d at 48; *see also Kenai Peninsula*, 743 P.2d at 1359 n.10.

likely to have been moved from District 36 to accommodate the Valdez area were "predominantly Alaska Native" and that the ANCSA boundary would be helpful to assess socioeconomic integration among the villages. Another witness explained how ANCSA boundaries can be significant for non-Native residents because they tend to delineate service areas for non-profit healthcare providers. And an expert witness analogously testified, when questioned about the boundary between Districts 36 and 39 coinciding with school district boundaries, that interactions between communities related to school functions could be a further indicia of socioeconomic integration within District 36. Finally, as discussed in more detail below, we agree with the 2001 redistricting superior court's reasoning affording more flexibility for rural communities when discussing socioeconomic integration.[126]

For the foregoing reasons, we affirm the superior court's ruling that the Board gave a constitutionally sufficient hard look at where to place the Valdez area.

## B. Mat-Su's And Valdez's Substantive Constitutional Challenges

### 1. Aside from the "Cantwell Appendage," Mat-Su's and Valdez's article IV, section 6 arguments fail.

Mat-Su and Valdez contend the superior court erred by concluding that House Districts 29 and 36 are constitutional under article VI, section 6.[127] They assert that the districts are not compact and are not socioeconomically integrated. Mat-Su

---

[126] *See In re 2001 Redistricting Cases*, No. 3AN-01-8914 CI, 61 (Alaska Super., Feb. 1, 2002) (explaining that rural communities are not necessarily "interconnected by road systems" or "integrated as a result of repeated and systematic face to face interaction" but may be "linked by common culture, values, and needs").

[127] House District 29 contains portions of the Mat-Su Borough, including parts of Palmer and Wasilla, as well as the Valdez area. House District 36 is quite large; it includes Holy Cross and Huslia in the western portion, stretches east to the Canadian border, has Fairbanks's Goldstream Valley, and has an appendage cutting into the Denali Borough and the Mat-Su Borough to reach Cantwell. *See* Appendix A.

additionally asserts that the Board did not create districts "as near as practicable" to the population quotient because the Mat-Su districts as a whole are overpopulated compared to other districts.[128]  We address each argument in turn.

### a.      Compactness

### i.      House District 29

Mat-Su takes issue with House District 29 extending to the Valdez area without containing Richardson Highway communities on the road between the Valdez area and the Mat-Su Borough.  Mat-Su asserts that the "cutout of the road system makes the shape of the district less compact and orphans [the Valdez area] from its transportation link to the [Mat-Su Borough] and the communities in its immediate area that it associates with regularly."

We have instructed that " 'corridors' of land that extend to include a populated area, but not the less-populated land around it, may run afoul of the compactness requirement."[129]   House District 29 does not contain the Richardson Highway communities along the road to the Valdez area, but it contains the "less-populated land" around Valdez.  Mat-Su cites no relevant authority for its proposition that inability to travel by road between communities in a House district without leaving the district renders it non-compact.  Indeed, it would be unworkable in rural Alaska to impose a requirement of being able to travel by road between any two points in a district without crossing district borders.[130]  The superior court did not err by determining that

---

**128**      Alaska Const. art. VI, § 6 (requiring house districts to "contain a population as near as practicable to the quotient obtained by dividing the population of the state by forty").

**129**      *Hickel*, 846 P.2d at 45-46.

**130**      *See, e.g.*, *In re 2001 Redistricting Cases* (*2001 Redistricting II*), 47 P.3d
(continued...)

"[House] District 29's shape is the natural result of Alaska's landscape and irregular features" and that it is compact.

### ii. House District 36

House District 36 is a large, horseshoe-shaped district composed of portions of three different boroughs and encompassing 35% of Alaska's land. An "appendage" of House District 36 reaches between House Districts 29 and 30 to include Cantwell, but not the surrounding land or communities.[131] Cantwell otherwise likely would have been placed with the rest of the Denali Borough in House District 30. As a Denali Borough community, Cantwell would have been sufficiently socioeconomically integrated with the rest of the Denali Borough within House District 30 as a matter of law.[132]

---

[130]    (...continued)
1089, 1092 (Alaska 2002) ("[N]either size nor lack of direct road access makes a district unconstitutionally non-compact . . . ."). On the other hand, in areas dependent on road transportation direct road access is a feature of communities of interest and socioeconomic integration.

[131]    Valdez argues that House District 36 also contains an inappropriate appendage "carv[ing] out Glennallen and neighboring population along the Glenn Highway." This argument fails; District 36 contains several communities along the Richardson and Glenn Highways near Glennallen but does not appear to carve out a bizarre appendage or corridor. *See Hickel*, 846 P.2d at 45-46 (" '[C]orridors' of land that extend to include a populated area, but not the less-populated land around it, may run afoul of the compactness requirement. Likewise, appendages attached to otherwise compact areas may violate the requirement of compact districting.").

[132]    *2001 Redistricting I*, 44 P.3d 141, 146 (Alaska 2002) (referring to Anchorage, a consolidated city and borough, as "by definition socio-economically integrated"); *Hickel*, 846 P.2d at 51 ("By statute, a borough must have a population which 'is interrelated and integrated as to its social, cultural, and economic activities.' " (quoting AS 29.05.031)); *cf. id.* at 51 n.20 (stating that splitting "a borough which otherwise [could] support an election district will be an indication of gerrymandering for not preserving the government boundaries").

The superior court acknowledged that the Cantwell appendage makes House District 36 less compact; the court then examined whether House District 36 is socioeconomically integrated and adopted the Board's argument that including "Cantwell [was] justified because Cantwell is socio-economically integrated with the Ahtna region (the rest of which was placed with District 36)." This analysis runs afoul of our *Hickel* guidance: "The requirements of article VI, section 6 shall receive priority *inter se* in the following order: (1) contiguousness and compactness, (2) relative socioeconomic integration, (3) consideration of local government boundaries, (4) use of drainage and other geographic features in describing boundaries."[133] Both the Board and the superior court appear to have prioritized more socioeconomic integration over compactness.

The Board recognized that adding Cantwell to House District 36 created potential compactness problems. One Board member asked the Board's attorney:

> [W]e have noted the socioeconomic reasons for taking Cantwell out. Obviously it is not a compact change, right, so do you have any concerns about the compactness, or do you believe that in this instance, for socioeconomic reasons that we took Cantwell out of the [Denali] borough probably are sufficient to overcome the . . . loss of compactness with that removal?

The attorney agreed that adding Cantwell rendered House District 36 less compact, advising that whether it made sense was "a coin toss" and that the Board was "balancing constitutional concerns."

When a more compact district would be sufficiently socioeconomically integrated, the Board may not sacrifice compactness in favor of greater socioeconomic

---

[133] *Hickel*, 846 P.2d at 62; *cf. id.* at 45 n.10 (providing socioeconomic integration may be diminished only to maximize contiguity and compactness).

integration.[134]  We therefore hold that the Cantwell appendage to House District 36 was unconstitutionally drawn.

### b.    Socioeconomic integration

### i.    House District 29

Valdez and Mat-Su first argue that the superior court misapplied precedent by assuming that if the Valdez area and the Mat-Su Borough independently were socioeconomically integrated with Anchorage, then they also must be socioeconomically integrated with each other.  The court was "greatly influenced" by its interpretation of *Kenai Peninsula*,[135] relying heavily on a "regional integration" concept to determine that the Valdez area and the Mat-Su Borough are socioeconomically integrated.  The court said its conclusion that House District 29 is socioeconomically integrated may have been different had it not interpreted *Kenai Peninsula* to hold that "regional integration" is sufficient to achieve socioeconomic integration.  Valdez further contends the court misconstrued precedent by assuming that the Mat-Su Borough and the Valdez area each are socioeconomically integrated with Anchorage.  Because the court's interpretation of *Kenai Peninsula* was erroneous, we do not need to reach whether the two areas each are socioeconomically integrated with Anchorage.

In *Kenai Peninsula* we considered whether a House district containing North Kenai and South Anchorage was socioeconomically integrated.[136]  We saw minimal interaction; we said: "[T]o the extent that they interact at all, they do so as a

---

[134]    *Id.* at 62 (prioritizing article VI, section 6 requirements as follows: "(1) contiguousness and compactness, (2) relative socioeconomic integration").

[135]    743 P.2d 1352 (Alaska 1987).

[136]    *Id.* at 1361-62.

consequence of the nexus between Kenai and Anchorage."[137]  We framed the issue as "whether interaction between the communities comprising [the challenged district] and communities outside the district but within a common region sufficiently demonstrates the requisite interconnectedness and interaction mandated by article VI, section 6."[138] We considered that North Kenai and South Anchorage are geographically close, that they are connected by highways and daily airline flights, and that both are "linked to the hub of Anchorage"; we also noted that the North Kenai and South Anchorage areas were linked economically and socially.[139]  Determining that the challenge "[drew] too fine a distinction between the interaction of North Kenai with Anchorage and that of North Kenai with South Anchorage," we held that "any distinctions between Anchorage and South Anchorage [were] too insignificant to constitute a basis for invalidating the state's plan."[140]

Analogizing North Kenai and South Anchorage to the Valdez area and the Mat-Su Borough, the superior court concluded they were "relatively socio-economically

---

[137]     *Id.* at 1362.

[138]     *Id.* at 1363.

[139]     *Id.* at 1362-63.

[140]     *Id.* at 1363 & n.17.  We since have cited *Kenai Peninsula* for the following:

> In areas where a common region is divided into several districts, significant socio-economic integration between communities within a district outside the region and the region in general "demonstrates the requisite interconnectedness and interaction," even though there may be little actual interaction between the areas joined in a district.

*Hickel v. Se. Conf.*, 846 P.2d 38, 46 (Alaska 1992).

integrated . . . because both communities are socio-economically integrated with Anchorage." But this conclusion takes *Kenai Peninsula* too far. Even if both the Valdez area and the Mat-Su Borough were socioeconomically integrated with Anchorage, it does not necessarily follow that they are socioeconomically integrated with each other. North Kenai was socioeconomically integrated with South Anchorage primarily because evidence supported a conclusion that North Kenai was socioeconomically integrated with Anchorage as a whole.[141] South Anchorage and Anchorage were not merely socioeconomically integrated, they were indistinguishable for the constitutional analysis.[142] The same cannot be said of the Mat-Su Borough or the Valdez area; each community is entirely separate from, rather than a neighborhood or region within, Anchorage.

Mat-Su and Valdez next contend that the superior court erred when it determined House District 29 was socioeconomically integrated partly because it was drawn similarly in the 2002 and 2013 redistricting proclamations. We previously have noted that the requirement for House districts to be "relatively" integrated "means that we compare proposed districts to other previously existing and proposed districts as well as principal alternative districts to determine if socio-economic links are sufficient."[143] With this principle in mind, the superior court compared House District 29 in the 2021 Proclamation with House District 9 from the 2010 redistricting cycle and House District 12 from the 2000 redistricting cycle. The court noted substantial similarities between the earlier House districts, including that they both paired portions of the Mat-Su Borough with the Valdez area. The court reasoned that prior redistricting pairings were evidence

---

[141]     *See Kenai Peninsula*, 743 P.2d at 1362-63.

[142]     *See id*. at 1363 & n.17.

[143]     *Hickel*, 846 P.2d at 47.

that the Mat-Su Borough and the Valdez area are "relatively integrated."[144]

Mat-Su and Valdez disagree. Valdez contends that the crucial difference from the historic districts is House District 29 does not contain the Richardson Highway communities that rendered the prior districts socioeconomically integrated. But, as we discuss below, in addition to considering the historical districts, the superior court generally found evidence of sufficient interactions between the Valdez area and the Mat-Su Borough to render House District 29 socioeconomically integrated. The Valdez area's greater socioeconomic integration with certain Richardson Highway communities does not preclude a finding that the Valdez area is also socioeconomically integrated with the Mat-Su Borough.

The superior court's factual inquiry into interactions between the Valdez area and the Mat-Su Borough found "evidence of at least minimal socio-economic links":

> These include geographic proximity and connection via the road system, shared interests in the outdoor recreation industry, and common hunting and fishing areas in the region around Lake Louise, Klutina Lake, and Eureka. They also have at least some shared ties to the oil industry. The nearest hospital to Valdez, at least by road, is located in the Mat-Su Borough. Similarly, the nearest car dealerships[] and large box stores are located in the Mat-Su. Valdez and Mat-Su also share an interest in maintenance and development of the state highway system . . . .
>
> The communities in District 29 are served by school

---

[144] Using prior redistricting maps to support or oppose current redistricting options has limitations. Redistricting occurs every decade, and in the intervening years community population and socioeconomic integration may wax and wane. As we discuss below in connection with the second round of the 2021 redistricting cycle litigation, the nature of legal challenges, if any, raised and resolved in prior redistricting cycles also are important. For example, a prior House or Senate district that never was challenged is not dispositive evidence of constitutional compliance.

districts that are a part of home rule or first-class municipalities or boroughs, meaning their funding is obtained in part from a local tax base, and these home rule communities also have a shared interest in debt reimbursement from the legislature. Similarly, Valdez school sports teams compete against sports teams in the Mat-Su Borough. (Footnotes omitted.)

Mat-Su and Valdez do not challenge these findings, instead asserting that these interactions are insufficient to satisfy article VI, section 6's socioeconomic integration requirement because the Board failed to engage in reasoned decision-making and did not maximize socioeconomic integration. But, as the superior court correctly pointed out, we have not required that the Board maximize socioeconomic integration in every House district nor have we held that there is a right to be paired with other most closely integrated communities.[145] The interactions the court identified align with the types of interactions previously identified as evidencing socioeconomic integration. In particular, the shared recreation and fishing sites, transportation networks, economic links, interests in the state highway system's development, and competition between sports teams all are considerations similar to those previously recognized as supporting finding socioeconomic integration.[146] Although the court placed too much emphasis on both communities' connections with Anchorage, we affirm the court's determination that House District 29 is sufficiently socioeconomically integrated to satisfy article VI, section 6.

---

[145] Mat-Su concedes this point in its petition: "[T]here is nothing in case law that provides for a right to be placed together with other socioeconomic areas, even areas in which a location may be *more* socioeconomically integrated, so long as the other area the location is placed with is also socioeconomically integrated." (Emphasis in original.)

[146] *See Kenai Peninsula*, 743 P.2d at 1362-63; *see also Hickel*, 846 P.2d at 46-47.

### ii.    House District 36

Valdez's sole contention is that there is insufficient evidence of interaction and interconnectedness between communities within this extremely large House district. This argument failed before the superior court and fails with us as well.

During the 2001 redistricting cycle a superior court facing a similar argument commented on the practicalities of socioeconomic integration in rural Alaska:

> Often the communities within such large districts are geographically isolated and small in population. They are not interconnected by road systems or by other convenient means of transportation. Such communities are not integrated as a result of repeated and systematic face to face interaction. Rather they are linked by common culture, values, and needs. The constitutional requirement of socio-economic integration does not depend on repeated and systematic interaction among each and every community within a district. Rather, the requirement in Article VI, Section 6 of the Alaska Constitution may, by its very terms, be satisfied if the "area" comprising the district is relatively socio-economically integrated without regard to whether each community within the "area" directly and repeatedly interacts with every other community in the area.[147]

This understanding of socioeconomic integration in rural House districts provides needed flexibility for pairing rural communities that cannot have the extensive interconnectedness and interaction of urban communities. For example, isolated rural communities off the road system may be interconnected through their use of and dependence on the same rivers for travel and fishing and the same migratory animals for

---

[147]    *In re 2001 Redistricting Cases*, No. 3AN-01-8914 CI, 61 (Alaska Super., Feb. 1, 2002).

subsistence. Although we have noted that mere homogeneity generally is insufficient,[148] socioeconomic integration in this rural Alaska context can be supported by evidence of interdependence and related "common culture, values, and needs" rather than requiring interactions between all communities.[149]

The superior court noted that House "District 36 generally (though not perfectly) encompasses the Doyon and Ahtna ANCSA regions." The court cited trial evidence that the region's people share socioeconomic similarities, as "they engage in subsistence, access similar types of healthcare, face similar challenges with regard to access to utilities, and have similar concerns with regard to the quality of rural schools." There also was trial testimony that Doyon and Ahtna have primarily Athabascan shareholders sharing "common language and culture."

We affirm the superior court's determination that House District 36 is sufficiently socioeconomically integrated to satisfy article VI, section 6.

### c. "As near as practicable" to the population quotient

Mat-Su contends that the Board violated article VI, section 6's requirement that each House district "contain a population as near as practicable to the quotient obtained by dividing the population of the state by forty."[150] Mat-Su argues that House Districts 25-30, containing the Mat-Su Borough, are unconstitutionally overpopulated. It is true that House Districts 25-30 each are overpopulated and that House Districts 25-29 each are overpopulated by about 2.5%.

---

[148]    *Hickel*, 846 P.2d at 46.

[149]    *In re 2001 Redistricting Cases*, No. 3AN-01-8914 CI, at 61 (Alaska Super., Feb. 1, 2002); *see also Kenai Peninsula*, 743 P.2d at 1363 (discussing socioeconomic integration requirements in context of what is "reasonable and not arbitrary").

[150]    Alaska Const. art. VI, § 6.

Before the 1999 constitutional amendments, maximum deviations below ten percent were insufficient, without more, to make out a prima facie case that a plan or part thereof was unconstitutional.[151] The section as amended now requires "equality of population 'as near as practicable' ";[152] we have noted that modern technology "will often make it practicable to achieve deviations substantially below the ten percent federal threshold, particularly in urban areas."[153] But Mat-Su seems to misunderstand our *2001 Redistricting I* analysis.

We concluded in that case that the Board had failed to draw Anchorage House districts containing as near as practicable the population quotient when the districts had maximum population deviations of 9.5%.[154] The Board had made a mistaken assumption that deviations within 10% automatically satisfied the constitutional requirement and accordingly had failed to attempt to further minimize the population deviations.[155] We explained that, because the Board had made no effort to further reduce population deviations, "the burden shifted to the [B]oard to demonstrate that further minimizing the deviations would have been impracticable in light of competing

---

[151]   *2001 Redistricting I*, 44 P.3d 141, 145 (Alaska 2002); *see White v. Regester*, 412 U.S. 755, 764 (1973) (instructing that districts differing from one another by more than 9.9% likely "would not be tolerable without justification 'based on legitimate considerations incident to the effectuation of a rational state policy' " (quoting *Reynolds v. Sims*, 377 U.S. 533, 579 (1964))).

[152]   *2001 Redistricting I*, 44 P.3d at 145-46.

[153]   *Id.* at 146.

[154]   *Id.* at 145-46.

[155]   *Id.* at 146.

requirements imposed under either federal or state law."[156]

Mat-Su interprets that decision as requiring the Board to "justify any failure to reduce population deviance across districts" and asserts that the Board failed to meet this burden. But that is not what *2001 Redistricting I* requires, and Mat-Su points to nothing in the record indicating the Board failed to make efforts to reduce population deviations in the Mat-Su Borough. We agree with the superior court that the Board was not required to further justify the noted de minimis deviations.

### 2. Mat-Su's equal protection challenge fails.

#### a. One person, one vote

Mat-Su argues that the House districts' over-populations also violate the constitutional "one person, one vote" requirement. Equal protection requires the State to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable."[157] "[T]he overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the state."[158] We have noted that "minor deviations from mathematical equality . . . are insufficient to make out a prima facie case of invidious discrimination."[159] As Mat-Su correctly recognizes, article VI, section 6's population equality and one person, one vote requirements are "by and large synonymous." For the same reason we affirmed the

---

[156]    *Id.*

[157]    *Hickel v. Se. Conf.*, 846 P.2d 38, 47 (Alaska 1992) (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

[158]    *Id.* (quoting *Reynolds*, 377 U.S. at 579).

[159]    *Id.* at 47-48 (quoting *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1366 (Alaska 1987)).

superior court's decision on Mat-Su's challenge to article VI, section 6's population quotient requirement, we affirm the court's decision that House Districts 25-30 satisfy the "one person, one vote" requirement under an equal protection analysis.

### b.       Fair and effective representation

Mat-Su also argues that the Mat-Su Borough and its citizens are denied fair and effective representation in violation of equal protection. Mat-Su argues that the Board prioritized the Fairbanks and Anchorage areas over the Mat-Su Borough, evidencing discriminatory intent against the Mat-Su Borough.[160]

The superior court found that the small over-populations in the Mat-Su Borough House districts resulted from bringing 4,000 Valdez area residents into House District 29. But, as we already have discussed, the evidence indicates the Board considered the available options and ultimately determined constitutional considerations were best served by placing the Valdez area with the Mat-Su Borough. We see no evidence that the Board's decision was predicated on an illegitimate intent to favor the Fairbanks or Anchorage areas or that there are partisan overtones to the decision. As the Board persuasively points out, the Mat-Su Borough's population equaled 5.84 House districts, the Board proposed a plan with 6 House districts in the area, and the Board's final plan created 6 House districts over which Mat-Su Borough voters have control.

We are not persuaded that the Board acted with discriminatory intent such that the Mat-Su Borough and its voters were denied fair and effective representation in violation of equal protection.

---

[160]     *See supra* pp. 14-17 (discussing equal protection analysis for fair representation claims). Mat-Su Borough does not engage in the traditional three-step analysis, focusing only on alleged discriminatory intent.

## C. Skagway's Substantive Constitutional Challenges

Skagway contends that the superior court should have determined House Districts 3 and 4 violate article VI, section 6's socioeconomic integration requirement and that it should have considered Skagway's equal protection claim. House Districts 3 and 4 include the Juneau, Skagway, and Haines Boroughs, as well as other southeast Alaska communities.[161] Skagway contended, and the superior court agreed, that a clear majority of people testifying about Skagway's placement preferred districting Skagway with downtown Juneau. The Board conceded in its petition to us that a "Board member noted that the weight of public testimony tipped in favor of keeping Skagway and downtown Juneau districted together," although that member ultimately did not vote for that option.

At trial Skagway argued that its separation from downtown Juneau, with which it has strong socioeconomic ties, violated article VI, section 6's socioeconomic integration requirement; that the Board violated Skagway's equal protection rights; and that the Board violated article VI, section 10's public hearings requirement and thus Skagway's due process rights. The superior court rejected Skagway's section 6 socioeconomic integration challenge, and, believing that it encompassed the fair representation argument as well, rejected it without a separate analysis. The court instead invalidated House Districts 3 and 4 under its blended "hard look" and due process analysis because the Board failed "to make a good-faith attempt to incorporate the public testimony of Alaska citizens," who favored keeping Skagway with downtown

---

[161] The 2010 redistricting cycle had placed Skagway in a House district with downtown Juneau. In this cycle, the Board unanimously voted to place Skagway, fellow port towns Haines and Gustavus, and part of Juneau's Mendenhall neighborhood in House District 3; Mendenhall was split between House Districts 3 and 4. *See* Appendix A.

Juneau.  Because we reverse the superior court's "hard look" invalidation of House Districts 3 and 4, we address Skagway's arguments.

### 1.    Socioeconomic integration

Skagway argues that it is more socioeconomically integrated with downtown Juneau than any other part of the Juneau Borough, including the Mendenhall neighborhood.  Skagway mistakenly asserts that socioeconomic integration must be maximized, but, as we have discussed earlier, article VI, section 6 calls for House districts "containing as nearly as practicable a relatively integrated socio-economic area"; this flexible language means that some degree of integration can be sacrificed to achieve greater contiguity and compactness.[162]  The Board correctly notes that House Districts 3 and 4 are more compact than the 2010 redistricting cycle's districts, and Skagway does not meaningfully contest this point.  And in line with our *Groh v. Egan* holding, trial evidence supports a conclusion  that House District 3 is sufficiently socioeconomically integrated because the Skagway, Haines, and Juneau Boroughs share "close transportation ties," "Juneau serv[es] as an economic hub for Haines and Skagway," and the three communities historically "have always been closely linked."[163]  Skagway notes that *Groh* was decided before Juneau's Mendenhall neighborhood was fully developed. But as we stated in *Hickel*:  "In areas where a common region is divided into several districts, significant socio-economic integration between communities within a district

---

[162]    *Hickel*, 846 P.2d at 45 n.10.  Skagway refers to *Hickel*'s Appendix E, the superior court's explanation of its changes to the special masters' interim redistricting plan.  *Id.* at 63-96.  In *Hickel* the superior court said it made changes "to establish contiguity, to maximize socio-economic integration, to avoid pitting incumbent minorities one against another, and to equalize population."  *Id.* at 73.  As the Board points out, that superior court merely was explaining changes, not announcing a new rule of law.

[163]    526 P.2d 863, 879 (Alaska 1974).

outside the region and the region in general 'demonstrates the requisite interconnectedness and interaction,' even though there may be little actual interaction between the areas joined in a district."[164]  Juneau fits within this description.

Skagway also asserts that the Board's map failed to keep the Mendenhall neighborhood intact, contending that the Board erred by ignoring neighborhood boundaries absent overriding constitutional considerations.[165]  But Skagway tethers this contention only to the Constitution's socioeconomic integration requirement.  We fail to see how merely dividing the Mendenhall neighborhood into two different House district renders either district vulnerable to a challenge that it is not socioeconomically integrated.

We affirm the superior court's holding that Districts 3 and 4 did not violate article VI, section 6's socioeconomic integration requirement.

### 2.    Fair representation and geographic discrimination

Skagway contends that placing its voters with the Mendenhall neighborhood dilutes Skagway's votes, implicating equal protection.  It faults the superior court for failing to address this issue even though Skagway briefed it at trial.  But Skagway's trial brief minimally addressed the fair and effective representation issue.  After setting out a short rule statement, Skagway asserted, without pointing to any evidence or making any substantive argument, that the Board "ignore[d] political subdivision boundaries and communities of interest" when it "combin[ed] Skagway with

---

[164]    846 P.2d at 46 (quoting *Kenai Peninsula*, 743 P.2d at 1363).  We note that this statement should not be expanded to mean that outside communities integrated with one part of a *borough* are always integrated with all parts of that borough.

[165]    *See 2001 Redistricting II*, 47 P.3d 1089, 1091 (Alaska 2002) (quoting approvingly superior court's statement that maintaining neighborhood boundaries is an "admirable goal" but "not constitutionally required" and concluding districts that split Eagle River were not unconstitutional merely because they split neighborhoods).

dissimilar communities." And contrary to Skagway's argument to us, the superior court *did* address Skagway's equal protection claim, saying that it was the same as Skagway's socioeconomic integration claim and thus did "not merit being addressed twice."

Skagway's petition for review does little to bolster its contention. Skagway asserts that its 4,000 voters will be drowned out by Mendenhall's 14,000 voters. Skagway also emphasizes advisory votes taken in 2000 and 2004 when Skagway and downtown Juneau voters supported increasing access to Juneau by expanding the ferry system, but Mendenhall voters seemed more supportive of a proposed road. But, like Mat-Su, Skagway fails to engage in the traditional three-step equal protection analysis for fair representation claims. Aside from noting that Member Simpson apparently favored the road, Skagway points to no evidence of discriminatory intent, such as secretive procedures, ignoring political subdivisions and communities of interest, or regional partisanship affecting House Districts 3 and 4.

Alaska's equal protection clause would be far too restrictive if a community's fair representation claim could be based on nothing more than a disagreement with other communities in its House district about a single public policy issue. Nor does Skagway's relatively small population compared to Mendenhall's create an equal protection claim. The ideal population for a House district is roughly 18,000 voters; Skagway's 4,000 voters will be overwhelmed by non-Skagway voters in any district, such as, for example, inclusion with downtown Juneau. We see no equal protection violation regarding Skagway and House Districts 3 and 4.[166]

---

[166] During the Constitutional Convention the redistricting goal was expressed as achieving "adequate and true representation by the people in their elected legislature, true, just, and fair representation." *See* 3 PACC 1835 (Jan. 11, 1956) (statement of Del. John S. Hellenthal). In the second round of 2021 redistricting litigation, discussed later in this decision, evidence included an email from Member Simpson clearly expressing

(continued...)

**D.     The Board's East Anchorage Ruling Challenges**

The superior court considered East Anchorage's challenges to the South Muldoon (House District 21) and Eagle River (House District 22) Senate District K pairing based on article VI, sections 6 and 10 and Alaska's equal protection and due process clauses.  The court held that the Senate district did not violate section 6 but that it violated section 10, due process rights, and the equal protection clause.  The Board challenges nearly every aspect of the court's findings and conclusions on this matter, ranging from pure questions of law to fact-intensive inquiries.  The Board also raises two general evidentiary issues which we discuss here because they effectively are relevant only to our East Anchorage discussion.

**1.     The Board's evidentiary issues**

**a.     The superior court did not abuse its discretion when it denied the Board's requests to compel discovery.[167]**

Many individual plaintiffs objected to the Board's discovery requests.  The relevant requests sought production of all communications:  (1) "[y]ou have sent to or

---

[166]     (...continued)
an approach to redistricting that involved ensuring more safe Republican seats and keeping Democrats at bay.  A portion of the email — expressing Member Simpson's approval that our March order reversing the superior court's remand of House Districts 3 and 4 will leave "Skagway . . . stuck with that arrangement for the next 10 years, at least" — may suggest some kind of geographic or political bias played a role.  But we see nothing in Skagway's petition for review suggesting that political advantage played a role in House Districts 3 and 4, and this email was not part of that record.  Without more information — perhaps unavailable due to the Board's improper use of executive sessions — we do not further pursue the issue.

[167]     "We generally review a trial court's discovery rulings for abuse of discretion."  *Marron v. Stromstad*, 123 P.3d 992, 998 (Alaska 2005).  Whether the superior court "weighed the appropriate factors in issuing a discovery order" is a matter we review de novo.  *Id.*

received from anyone . . . that relate in any way to the 2021 redistricting process";
(2) "[y]ou have sent or received that relate in any way to [y]our participation in this
lawsuit"; and (3) "between or among the [p]laintiffs that relate in any way to the 2021
redistricting process or the subject-matter of their lawsuit." Without first attempting to
confer with the plaintiffs the Board sought to compel discovery; the superior court
characterized the Board's argument as "the communications [were] relevant to show bias
and motive for impeachment purposes."

The superior court denied the Board's request to compel discovery, ruling
that the Board's production requests would elicit information only tangentially relevant
to the proceedings and that the benefit of the information did not outweigh the burdens
of production. The court recognized that "Alaska provides for liberal civil discovery"[168]
and that " 'evidence of bias is relevant and probative'[169] in most instances." But the
court relied on limiting factors from Alaska Civil Rule 26(b)(2)(A)[170] and an additional
instruction under Alaska Civil Rule 90.8(d) that "[t]he record in the superior court
proceeding consists of the record from the [Board] . . . as supplemented by such

---

[168]    *State v. Doe*, 378 P.3d 704, 706 (Alaska 2016).

[169]    *Ray v. Draeger*, 353 P.3d 806, 811 (Alaska 2015).

[170]    The relevant Rule 26(b)(2)(A) factors counseling denial of the Board's
request were:

> The discovery sought . . . [was] obtainable from some other
> source that [was] more convenient, less burdensome, or less
> expensive; . . . [and] the burden or expense of the proposed
> discovery outweigh[ed] its likely benefit, taking into account
> the needs of the case, the amount in controversy, the parties'
> resources, the importance of the issues at stake in the
> litigation, and the importance of the proposed discovery in
> resolving the issues.

additional evidence as the court, in its discretion, may permit." The court reasoned that the requests were overly broad and burdensome; that the information was obtainable (or already available) through other avenues, such as deposition or cross-examination; and that the requests had limited relevance due to the scope of the proceedings. The court also noted that the Board had not filed a certification of good faith attempts to confer as required by Rule 37(a)(2)(B) and that the Board justified this omission based only on the expedited nature of the proceedings without citing authority.

The Board suggests that the superior court unfairly discussed the Board's political leanings without allowing "the Board to discover and present evidence of the political affiliation and biases of the plaintiffs to the redistricting matters." These arguments notwithstanding, the Board fails to request any specific relief from us related to the court's alleged discovery error; the Board certainly does not suggest that the court's decision on the merits of the Board's redistricting efforts should be reversed due to the alleged error. Although evidence of party or witness bias typically is relevant and probative, the Board fails to persuade us that the superior court acted unreasonably by not compelling the disputed production. We find it particularly notable that the Board has not explained how further knowledge of any plan challenger's political motivations would have meaningfully benefitted the Board's trial position that its final redistricting plan satisfied the Alaska Constitution's requirements and did not involve partisan gerrymandering. The court did not abuse its discretion by denying the Board's request to compel production.

**b.** **The superior court did not abuse its discretion when it adopted streamlined proceedings regarding witness testimony at trial.**[171]

Because this was an expedited case with a short time for trial, the superior court relied on Board members' depositions submitted by the plaintiffs and allowed the parties to pre-file direct testimony rather than giving live direct testimony. Although the court had allowed for live re-direct examination of witnesses who were cross-examined by other parties, East Anchorage did not cross-examine Board members. The court denied the Board's subsequent request to engage in re-direct examination of its members. The court indicated that the Board could instead submit supplemental Board member affidavits. The Board did not do so. But the Board now complains about the court not allowing live re-direct examination of the Board members, contending that the court's "heavy reliance" on depositions in its analysis of the Board's "secretive process" involving the Senate district pairings prejudiced the Board by denying it "the opportunity to explain its decisions."[172]

The Board cites case law supporting the general proposition that a civil

---

[171] "We exercise our independent judgment when interpreting Alaska's civil rules, but [we] review a superior court's procedural decisions for abuse of discretion." *Werba v. Ass'n of Vill. Council Presidents*, 480 P.3d 1200, 1204 (Alaska 2021) (alteration in original) (quoting *Rockstad v. Erikson*, 113 P.3d 1215, 1219-20 (Alaska 2005)).

[172] We find it difficult to give serious consideration to the Board's contention that it has been denied the opportunity to explain its Senate District K pairing decision. Had the Board conducted redistricting business in open sessions, the public could have had a real-time understanding of the Board members' positions and reasoning. And Board members surely could have explained their decisions when they gave sworn depositions, pre-filed affidavit testimony, or were given the chance to file later supplemental affidavit testimony.

litigant has the right to confront adverse witnesses.[173]  But we struggle to comprehend how the right to confront witnesses *against* the Board gives rise to a right to confront the Board members' own pre-filed depositions and affidavits.  The depositions and affidavits gave the Board members a full and unfettered opportunity to justify and explain their decision and actions regarding Senate District K.  And the Board chose not to submit supplemental affidavits despite being given the opportunity to do so.  We see no error on this point.

The Board also contends that Alaska Civil Rule 46(b) dictates the order of evidence presented at trial and argues that the superior court should have allowed the Board "to put on its case."  But that Rule instructs that the order of evidence is left to the court's "sound discretion."[174]  The court did not abuse its discretion in the way it permitted witness testimony, especially in light of the abridged timeline for the proceedings, and any possible error would have been rendered harmless had the Board accepted the court's invitation to file supplemental affidavits.  Indeed, we commend the superior court's tremendous efforts expediting the trial and its final decision in this challenging litigation.

### 2.     The Board's article VI, section 10 arguments

We now review the superior court's application of article VI, section 10's public hearings requirement.[175]

---

[173]     *See Thorne v. Dep't of Pub. Safety*, 774 P.2d 1326, 1332 & n.14 (Alaska 1989) (holding "right to confront and cross-examine witnesses is one right, founded upon due process and fundamental fairness, which civil defendants do enjoy").

[174]     Alaska R. Civ. P. 46(b).

[175]     We do not reach the superior court's blended "hard look" and due process analysis regarding Senate District K because we affirm its remand to the Board on
(continued...)

### a.  Superior court's article VI, section 10 ruling

The superior court concluded that the Board's Senate district pairings violated article VI, section 10 in two ways.  The first violation related to article VI, section 10's requirement that the Board adopt one or more "proposed redistricting plans" within the first 30 days of its tenure; the court interpreted this as meaning that the Board must adopt a draft of both the House districts and Senate district pairings within the first 30 days.  The court concluded that the Board violated section 10 by not adopting a Senate plan within the first 30 days.  The court also expressed skepticism that "third-party plans" with Senate district pairings were adequate because they were not "proposed" by the Board.

The second violation was based on section 10's public hearings requirement; the superior court considered this issue intertwined with procedural due process.  The court found:  "[T]here was no opportunity for the public to comment on the Senate pairings that were actually proposed by the members of the Board."  The court noted that the Board had taken third-party maps with Senate district pairings on its statewide public hearings road show but that the Board did not "hold public hearings on Senate pairings it actually proposed on the final [H]ouse map."  The court also found that the Board did not "make good-faith attempts to incorporate public testimony into the Board's final plan," observing that "the vast majority of both East Anchorage and Eagle River residents were strongly against splitting either region and combining one with the other."  The court concluded that by failing "to take an appropriate 'hard look' at the Senate pairings," the Board had violated East Anchorage Plaintiffs's constitutional rights under article VI, section 10.

---

[175]  (...continued)
unconstitutional political gerrymander grounds.

### b.     Article VI, section 10's 30-day deadline and the meaning of "proposed redistricting plan"

The Board does not meaningfully contest the superior court's interpretation of "proposed redistricting plan" to include a House district map with Senate district pairings, pointing only to evidence suggesting that past Boards waited until late in the process to make Senate pairings. The Board asserts that adopting third-party Senate plans for its public road show nine days late, even if unconstitutional, was "harmless" and did not prevent the public from offering meaningful feedback on the Senate district plans. East Anchorage acknowledges that third-party maps included Senate district pairings, arguing generally that the Board "failed to hold any hearings regarding any specified [S]enate pairings proposal, and actively shut down discussion and testimony at its public meetings before November 8." East Anchorage cites citizens' testimony from October 4 and 30 requesting that the Board release Senate pairings for comment.

We agree with the superior court's thorough analysis of the question, and we hold that article VI, section 10 calls for one or more "proposed redistricting plans" — including both House and Senate districts — within the first 30 days. It is difficult to see how section 10's drafters could have envisioned a timeline allowing the Board to promulgate only a House district map within the first 30 days and then wait until the very end of the 90-day redistricting period to propose Senate districts: Senate district pairings then conceivably could escape scrutiny at public hearings. But we disagree with the superior court that the Senate district maps drawn by third parties, adopted by the Board and taken on the road show, are categorically inadequate for section 10 purposes. Third-party participation and input should be welcome, and section 10 states that the Board need only "adopt" a proposed redistricting plan, not that it need propose the adopted plan. The Board "adopted" third-party plans with Senate district pairings to take on its

road show, albeit over a week late.[176]

We therefore agree with the Board that its failure to adopt a Senate district plan within 30 days was harmless error. Despite the roughly one-week delay in initially adopting a proposed plan that included Senate districts, the public had an opportunity to comment on potential Senate district pairings throughout the Board's public road show and toward the end of the 90-day period when the Board was focused on making the Senate pairings. Had the Board actually refused to adopt and present any Senate district plans until later in the process, we might draw a different conclusion.

### c. Article VI, section 10's public hearings requirement and procedural due process

#### i. Hearings

The superior court concluded that article VI, section 10 requires "public hearings . . . on all plans proposed by the Board." (Alteration in original.) That provision states:

> Within thirty days after the official reporting of the decennial census of the United States or thirty days after being duly appointed, whichever occurs last, the board shall adopt one or more proposed redistricting plans. *The board shall hold public hearings on the proposed plan, or, if no single proposed plan is agreed on, on all plans proposed by the board.*[177]

---

[176] Adopting proposed plans for public comment is designed to focus public attention and testimony on the Board's proposals. That purpose is not well-served by indiscriminately adopting third-party plans with no suggestion of tentative Board approval, and even less so by Senate districts proposed in the third-party plans based on House districts substantially different from those the Board tentatively endorsed. In this case the Board may not have complied with the spirit of article VI, § 10, but the Board's actions were minimally compliant with its literal requirements.

[177] Alaska Constitution, art. VI, § 10 (emphasis added).

The superior court's interpretation appears to be taken out of context. The most natural reading is that public hearings are required on one or more plans adopted within the 30-day window. We have interpreted, but not previously held, that section 10 requires hearings only on plans proposed or adopted within the first 30 days:

> Under article VI, section 10 of the Alaska Constitution, the Alaska Redistricting Board (the Board) must adopt one or more proposed redistricting plans within 30 days after receiving official census data from the federal government. *The Board must then hold public hearings on the proposed plans and adopt a final plan within 90 days of the census reporting.*[178]

The emphasized text can be read to mean that, if the Board cannot agree on one plan within 30 days, *all* plans, regardless of when they are proposed, are subject to the public hearings requirement. This highly semantic reading seems unnatural; we instead hold that section 10 requires hearings on plans adopted within the first 30 days.

### ii.    Procedural due process

Procedural due process under article I, section 7 — prohibiting the deprivation of life, liberty, or property without due process of law — requires, at a minimum, appropriate "notice and an opportunity to be heard" given the context.[179] The superior court did not tether its limited procedural due process analysis to a specific right to which procedural due process might apply, and the parties did not grapple with this threshold issue in their petitions for review. And we found no arguments in the parties' petitions for review about how procedural due process requirements actually play a role in this context. Much like the superior court's substantive due process analogy in its

---

[178]    *2011 Redistricting III*, 294 P.3d 1032, 1033 (Alaska 2012) (emphasis added).

[179]    *Haggblom v. City of Dillingham*, 191 P.3d 991, 995 (Alaska 2008).

"hard look" analysis, there is less here than meets the eye.[180]

To the extent the superior court considered that East Anchorage's due process rights were violated, we note the following. At least one proposed third-party redistricting map presented on the road show districted part of the Eagle River area with part of the Muldoon area. Given the volume of comments throughout the 90-day process about the Muldoon and Eagle River areas and their possible pairing, it would be difficult to conclude that there was no notice or meaningful opportunity to comment. Amici curiae Alaska Black Caucus's own compilation of public comments amply demonstrates this. And the Board's proposed plan was not a surprise; the Board did exactly what East Anchorage feared and testified against. East Anchorage thus had a chance to adequately comment on the Board's plans.

### 3.    The Board's equal protection arguments[181]

The superior court considered whether the Board created the two Eagle River area Senate Districts, K and L, with an illegitimate purpose. The court analyzed "whether there were secret procedures in the contemplation and adoption of these senate districts, whether there is evidence of partisanship, and whether the adopted senate boundaries selectively ignore political subdivisions and communities of interest."[182]

The superior court found "evidence of secretive procedures . . . in the Board's consideration and deliberation" of the Senate districts' pairings. The court pointed to "overwhelming public testimony against splitting and combining Eagle River"

---

[180]    *See supra* note 116 and related text.

[181]    *See supra* pp. 14-17 (discussing analytical framework for equal protection claim).

[182]    *See Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1372 (Alaska 1987) (establishing neutral factors test).

with the East Anchorage South Muldoon community that seemed to have been ignored by the three Board members who voted in favor of the Senate district pairings. Noting that immediately following an executive session one Board member moved to accept the Senate district pairings, the court reasoned that this "evidences not only secretive procedures, but suggests that certain Board members came to some kind of consensus either during executive session, or altogether outside of the meeting processes." The court discussed statements by the two Board members who did not support the Senate pairings, including statements that the Board had engaged in "naked gerrymandering" and that the Board members favoring the Senate district pairings "recognized that it was not possible to 'get to North Muldoon,' so instead South Muldoon was paired."

The superior court also found evidence of regional partisanship. The court noted the expert witness testimony about the Eagle River and South Muldoon House districts' political leanings, that the adopted Senate pairings would minimize South Muldoon's voting strength, and that there would be no competition in its Senate seat election. The court also pointed to the statement of one Board member, who favored these pairings, that splitting Eagle River gave it "more representation" and that Eagle River would control two Senate seats rather than one.

Finally, the superior court found that the Eagle River and Muldoon areas are separate "communities of interest." It based this determination on "ample public comment" and trial testimony, including that of an expert witness. The court found that "evidence in the record makes clear that any interaction [between Eagle River and Muldoon] includes only Eagle River residents driving into or through Muldoon, with Muldoon residents having no regular travel to or interaction with Eagle River." The court thus concluded "that the Board intentionally discriminated against residents of East Anchorage in favor of Eagle River[] and [that] this intentional discrimination had an illegitimate purpose."

The superior court then considered whether the pairings nonetheless led to more proportional representation. It found that "[p]airing Eagle River Valley with South Muldoon creates an average deviation of -1.68%, whereas pairing both Eagle River districts creates an average deviation of -1.18%." The court concluded that the challenged Senate pairings did not lead to more proportional representation.[183]

Finding an equal protection violation, the superior court then turned to the remedy. It found that the effect of disproportionality in Senate District K was de minimis. But distinguishing this case from *Kenai Peninsula*, the court noted that although "ultimately illegitimate, [the *Kenai Peninsula* Board] lacked the secretive processes and discrimination against the communities of interest and political areas apparent in this case." The court found that a mere declaration of unconstitutionality under a declaratory judgment was not appropriate and remanded the Senate district pairings to the Board, citing *Kenai Peninsula*'s dissent.[184]

### a. "Politically salient class" versus "communities of interest"

An equal protection claim requires an assertion that two groups are being treated differently; the Board contests the notion that the Muldoon and Eagle River areas are, for equal protection purposes, different communities. This is a somewhat confusing issue because we have used two different terms to describe groups of people who may be able to bring fair representation claims: "politically salient class" and "communities

---

[183] As the Board points out, the superior court's characterization of "under" and "over" representation was incorrect. We also note that the court's approach to the "proportionality of representation" defense reflects a misunderstanding of the defense. We address these issues below.

[184] *See Kenai Peninsula*, 743 P.2d at 1374-75 (Compton, J., dissenting) (explaining that merely offering declaratory relief in face of unconstitutional district does not suffice nor does it deter future boards).

of interest."[185]

The Board advocates using "politically salient class," stating that we "clarified" it as the proper term after the 1999 constitutional amendments.[186] We first used that term in the redistricting context in *2001 Redistricting I* when characterizing *Kenai Peninsula* as discussing politically salient classes.[187] In *Braun v. Denali Borough* we repeated the characterization,[188] and in *2011 Redistricting I* we cited the term's use in *2001 Redistricting I*.[189] But the *Kenai Peninsula* reference in *2001 Redistricting I* does not contain the phrase "politically salient class" — the phrase does not appear in the opinion.[190] We appear to have borrowed the term from a concurring opinion in the United States Supreme Court's *Karcher v. Daggett* decision.[191] Contrary to the Board's

---

[185] *Compare Kenai Peninsula*, 743 P.2d at 1365 n.21, 1372 ("[S]enate districts which meander and ignore political subdivision boundaries and communities of interest will be suspect under the Alaska equal protection clause."), *with Braun v. Denali Borough*, 193 P.3d 719, 730 (Alaska 2008) (describing *Kenai Peninsula* holding "that the [B]oard cannot intentionally discriminate against a borough or any other politically salient class of voters by invidiously minimizing that class's right to an equally effective vote" (quoting *2001 Redistricting I*, 44 P.3d 141, 144 (Alaska 2002))).

[186] The Board presumably focuses on "politically salient class" because in *2001 Redistricting I* we used the term in a footnote discussing "racial or political groups." 44 P.3d at 144 n.8.

[187] *Id.* at 144 (citing *Kenai Peninsula*, 743 P.2d at 1370-73).

[188] 193 P.3d at 730 (quoting discussion from *2001 Redistricting I*, 44 P.3d at 144).

[189] *2011 Redistricting I*, 274 P.3d 466, 469 (Alaska 2012).

[190] *See generally Kenai Peninsula*, 743 P.2d at 1352.

[191] *See* 462 U.S. 725, 754 (1983) (Stevens, J., concurring); *2001 Redistricting I*, 44 P.3d at 144 n.8.

assertion, we see nothing about our use of the term "politically salient class" suggesting we intended to "clarify," or even discuss, that the term was a change from the term "communities of interest."

The Board calls *Kenai Peninsula*'s mention of "communities of interest" "vague dicta." We disagree that the phrase qualifies as dicta; we used it when explaining the various factors we would consider to evaluate the equal protection claim before us.[192] And the Board engages with the same factors throughout its briefing. More aptly qualifying as "vague dicta" was our cursory use of the phrase "politically salient class" — which seems not to be a widely used redistricting term of art — when briefly describing *Kenai Peninsula*'s equal protection test in an inapposite context.

At trial the Board argued that East Anchorage "do[es] not state what race or ethnic group is being disenfranchised by the pairings" and that East Anchorage had not shown its voters to be "politically cohesive" or likely to vote in the same way. But the contexts in which we have used the term "politically salient class" do not support the Board's implication that the term relates only to race or political affiliation. We used the term in *2001 Redistricting I* to correct the Board's misunderstanding that *Kenai Peninsula* "entitle[s] political subdivisions to control a particular number of seats based upon their populations."[193] That was not our holding in *Kenai Peninsula*; we "simply held that the board cannot intentionally discriminate against a borough or any other 'politically salient class' of voters by invidiously minimizing that class's right to an equally effective vote."[194] Nor did the *Kenai Peninsula* holding referred to by *2001*

---

[192]    *Kenai Peninsula*, 743 P.2d at 1372.

[193]    *2001 Redistricting I*, 44 P.3d at 144.

[194]    *Id.* We drew the phrase from Justice Stevens's *Karcher* concurrence,
(continued...)

*Redistricting I* turn on racial discrimination or political party discrimination; the House district in dispute was deemed unconstitutional because of geographic discrimination.[195] *2001 Redistricting I* used the term in the context of a voter dilution claim.[196] *Braun v. Denali Borough*, a case about a borough reapportionment plan, referenced *2001 Redistricting I* for a similar proposition: equal protection did not guarantee Healy voters majority control of the Denali Borough Assembly merely because Healy had a majority of the population.[197] No redistricting decision has discussed "politically salient class" in the context of a challenge based on race or political affiliation. As East Anchorage points out, "community of interest" and "politically salient class" are simply phrases courts use "to name and refer to identifiable groups which are alleged to have been treated differently from other groups for purposes of conducting an equal protection analysis."

To allow for meaningful judicial review in redistricting cases, we formally adopt Professor Nicholas O. Stephanopoulos's "community of interest" definition, which in large part is consistent with our case law: A community of interest "is (1) a geographically defined group of people who (2) share similar social, cultural, and economic interests and (3) believe they are part of the same coherent entity. The first

---

[194]   (...continued)
defining a "politically salient class" as "one whose geographical distribution is sufficiently ascertainable that it could have been taken into account in drawing district boundaries." 462 U.S. at 754 (Stevens, J., concurring). Justice Stevens's definition contains no mention of race or political party. *Id.*

[195]   *Kenai Peninsula*, 743 P.2d at 1370-73. Indeed, we *dismissed* an equal protection claim in *Kenai Peninsula* based on political party discrimination. *Id.* at 1369-70.

[196]   44 P.3d at 144.

[197]   193 P.3d 719, 729-30 (Alaska 2008).

element, geographic demarcation, is necessary because of the American commitment to geographic districting."[198]

### b. Whether socioeconomic integration and "communities of interest" are synonymous

The Board argues that taking "communities of interest" into account already is required by article VI, section 6's mandate that House districts be socioeconomically integrated. The Board cites two examples of "[l]egal commenta[ry]" supporting this view. The first is a chart from the Brennan Center for Justice, simply compiling definitions of "community of interest" from numerous states using the term, and listing article VI, section 6 as the source of Alaska's "community of interest" inquiry.[199] This informative resource is hardly "legal commentary"; it is a two-page chart expressing no

---

[198] Nicholas O. Stephanopoulos, *Redistricting and the Territorial Community*, 160 U. Pa. L. Rev. 1379, 1430 (2012). Professor Stephanopolous used the term "territorial community" rather than "community of interest" because the latter "does not have to be spatially bounded" and "can be deemed to arise on the basis of any common concern, making the term notably imprecise and malleable." *Id.* at 1431-32. We address this concern by simply defining community of interest using his territorial community definition. Professor Stephanopolous suggests that election district boundaries should correspond with territorial communities to the extent possible and that courts should intervene when such communities unnecessarily are fused or split and the redistricting authority offers no reasonable explanation for the community disruption. *Id.* at 1385. Our case law similarly imposes a justification duty when a plausible equal protection violation claim is made. *See Kenai Peninsula*, 743 P.2d at 1371 ("Depending upon the primacy of the interest involved, the State will have a greater or lesser burden in justifying its" questioned action). *See generally Pub. Emps. Ret. Sys. v. Gallant*, 153 P.3d 346, 349 (Alaska 2007) ("We most often review [an act treating two groups differently] 'by asking whether a legitimate reason for disparate treatment exists, and, given a legitimate reason, whether the enactment . . . bears a fair and substantial relationship to that reason.' ").

[199] *Communities of Interest*, Brennan Center for Justice (Nov. 2010), https://bit.ly/BrennanCOI (last visited Feb. 18, 2023).

view and engaging in no analysis.[200] The Board's second source is a 1997 Virginia Law Review article citing article VI, section 6 as support, within a broader discussion of communities of interest, that "[t]he [C]onstitution[] of Alaska . . . require[s] consideration of communities of interest in apportionment."[201] The Board contends that article VI, section 6's socioeconomic integration requirement is the only place in Alaska redistricting law accounting for communities of interest. But neither the Board's sources nor our decisions support its conclusion.

A court asking whether a House district is socioeconomically integrated may look to its communities of interest because the analyses might overlap to a significant degree. But that does not mean Senate district pairings of two socioeconomically integrated House districts can never implicate concerns about fair representation for communities of interest. In *Kenai Peninsula* we stated that district boundaries "which meander and ignore political subdivision boundaries and communities of interest will be suspect under the Alaska equal protection clause."[202] A community of interest, for example, could stretch across two boroughs or be contained entirely within a borough. This reasoning finds support in a special master's report we commissioned in *Egan v. Hammond*:[203] The special master suggested that "Anchorage subdivisions [could] coincide with rough communities of interest" despite Anchorage's

---

[200]    *See id.*

[201]    Stephen J. Malone, *Recognizing Communities of Interest in a Legislative Apportionment Plan*, 83 VA. L. REV. 461, 466 (1997).

[202]    743 P.2d at 1365 n.21; *see also Hickel v. Se. Conf.*, 846 P.2d 38, 48 (Alaska 1992) (stating that "a state's desire to maintain political boundaries is sufficient justification for population deviation if consistently applied" (citing *Kenai Peninsula*, 743 P.2d at 1360)).

[203]    502 P.2d 856 (Alaska 1972).

lack of "clearly delineated ethnic ghettoes."[204]

The Board misframes the issue, setting out the seemingly absurd conclusion that, under the superior court's findings of fact and conclusions of law, "in 2002, it was constitutional to place portions of Eagle River and Muldoon in a single [*H*]*ouse* district because they are socioeconomically integrated, but in 2021, those areas of Anchorage cannot be in the same [*S*]*enate* district because they are different 'communities of interest.' " (Emphasis in original.) But in this case the challenge is about *splitting up* a community of interest to increase those residents' voting power over two Senate districts rather than one, not about putting separate communities of interest from one borough — which by law are socioeconomically integrated — together in the same legislative districts. It would not be contradictory to find that the Muldoon and Eagle River areas are, as a matter of law, socioeconomically integrated but nonetheless separate communities of interest.

The Board advances no argument whether the Muldoon and Eagle River areas are separate communities of interest beyond pointing out that they are socioeconomically integrated because they are in the same borough. The superior court's finding that the Muldoon and Eagle River areas constitute separate communities of interest was well-supported by the affidavit of East Anchorage's expert witness, Dr. Chase Hensel, a local anthropologist. Dr. Hensel noted the "one-way flow" of Eagle

---

[204] *Id.* at 894. We recognize that "ghetto" has more recently developed a colloquially pejorative connotation. *See, e.g.*, Camila Domonoske, *Segregated From Its History, How 'Ghetto' Lost Its Meaning*, NPR (Apr. 27, 2014), https://www.npr.org/sections/codeswitch/2014/04/27/306829915/segregated-from-its-history-how-ghetto-lost-its-meaning; Hugo Quintana, *"The Ghetto"*, THE MICH. DAILY (Oct. 14, 2021), https://www.michigandaily.com/michigan-in-color/the-ghetto/ (discussing historic and slang usage of "ghetto"). For historical accuracy and in light of the term's ongoing legal significance, *see, e.g.*, Tommie Shelby, *Justice, Work and the Ghetto Poor*, 6 L. & ETHICS HUM. RTS. 70 (2012), we quote the term as used in 1972.

River commuter traffic to East Anchorage; amici curiae Alaska Black Caucus noted that Member Marcum's assertion about the two communities sharing close ties was limited to her observation that some Eagle River residents commute to Anchorage via Muldoon Road. Dr. Hensel pointed out that the two communities' events and professional groups do not include one another. He noted different transportation service providers, local newspapers, histories and socioeconomic statuses, voting patterns, and racial and ethnic makeups. He also noted that Eagle River people described their community as "separate," "independent," "unique," and "stand alone."

Dr. Hensel's data also persuasively demonstrated racial and socioeconomic disparity between the two areas. In the Bartlett High School catchment area, primarily covering North and South Muldoon, students are 18% White and 70% economically disadvantaged. By contrast, in the Eagle River High School catchment area students are 68% White and 24% economically disadvantaged. Muldoon has 9% and northeast Anchorage has 14% of residents living below the poverty line, compared to just 3% in Eagle River and 2% in Chugiak. And 75% of North Muldoon students qualified for free and reduced lunch, compared to just 16% of Eagle River Valley's students.

North and South Muldoon are roughly 38% and 52% White respectively, while Eagle River Valley and North Eagle River are 76% and 75% White, respectively. Amici curiae Alaska Black Caucus provides similar statistics, pointing out that combining the two Muldoon House districts would create a majority-minority district, as would combining the Mountain View/Joint Base Elmendorf-Richardson (JBER) districts.

Given the definition of "community of interest" we have adopted, these observations support the superior court's findings that the Muldoon and Eagle River areas constitute separate communities of interest and that the Board's Senate district pairings split up the Eagle River community of interest to give it more political influence,

evidencing discriminatory intent.[205]  And even if we disagreed with the strong evidence that the Muldoon and Eagle River areas constitute separate communities of interest, it would be unwise to hold, *categorically*, that separate communities of interest cannot exist within a single borough.  As Alaska's largest city, Anchorage likely will continue growing more populous and diverse.  The historical, economic, or traditional significance of neighborhoods may change with time, and courts should remain open to hearing evidence that certain Anchorage neighborhoods are sufficiently different from one another that they constitute separate communities of interest.  Categorically holding that no subregion of Anchorage can be a community of interest would expose Alaskans to gerrymandering.

### c.     Discriminatory intent

### i.     Secretive procedures

The Board challenges the superior court's "speculative" finding that the Board engaged in "secretive procedures," a *Kenai Peninsula* fair representation test factor for discriminatory intent.[206]  But the superior court did not err by finding that the Board engaged in secretive procedures.

The Board began its Anchorage Senate district pairings on November 8. Member Bahnke first discussed her recommended Anchorage pairings, strongly expressing her feeling that the Eagle River and Muldoon areas each should be kept intact based on her review of public comments supporting the idea. Member Borromeo agreed, stating:  "I don't know why you would ever consider splitting Eagle River unless you were trying to expand Eagle River's reach in the Senate."

---

[205]     *See Kenai Peninsula*, 743 P.2d at 1372 ("District boundaries which meander and selectively ignore political subdivisions and communities of interest, and evidence of regional partisanship are also suggestive [of discriminatory intent].").

[206]     *Id.* (setting out multifactor totality of circumstances test).

Member Marcum then presented four versions of Anchorage-area pairings, noting that her four maps paired JBER with one of the Eagle River districts based on her personal experience that Eagle River is a "bedroom community" for JBER. Extensive discussions took place about why Member Marcum believed JBER and a portion of Eagle River should be paired and about pairing South Muldoon with part of Eagle River. When asked why putting the two Eagle River House districts together was not the most logical choice, Member Marcum stated: "Eagle River has its own two separate House districts. This actually gives Eagle River the opportunity to have more representation . . . ." Member Marcum obviously meant that if the Eagle River area were placed in two distinct Senate districts, Eagle River voters could control the election of two senators rather than one.

The Board did not appear to come to an agreement on the record about any map before voting. The superior court noted:

> In the midst of discussion, where several [S]enate pairings that split Eagle River and split the Muldoon area were offered by Member Marcum, Chairman Binkley states[:] "So I get a sense that there's a majority of, not consensus for the plan that [Member Marcum] has brought forward. If that's the case, I think we should move on to the last one that we got, which is Fairbanks."

Member Borromeo responded: "Mr. Chairman, before we do that, . . . is it your understanding that [Member Marcum is] only presenting one? Because there's so many . . . . I don't know what all of the different combinations were." The superior court noted that — and after review, we agree — it is unclear, and it was unclear to fellow Board members, which map a majority of the Board had agreed upon. The court thus inferred:

> [There was] some sort of coalition or at least a tacit understanding between Members Marcum, Simpson, and

Binkley. All three appeared to agree on all four of Member Marcum's maps with little public discussion. Most surprising was that at that time, it is unclear in the transcript, and was apparently also unclear to Member Borromeo, which of Member Marcum's maps the Board had apparently reached a majority on when the deliberative discussion was ended. It seems that what the three Board Members had reached a majority [on] was the only element of the map that was consistent between them: that Eagle River was split and North Eagle River was paired with JBER. That confusion is highlighted in the Chairman's choice to move on from Anchorage Senate pairings in the midst of deliberations to talk about Fairbanks to the surprise of Members Borromeo and Bahnke. There was no further public deliberation regarding Anchorage Senate pairings after this point, yet three Board members, the only three Board Members who signed the final proclamation in support, seemed to at some point understand which set map of [S]enate pairings to offer for adoption among the four.[207]

After discussing Fairbanks-area Senate district pairings, the Board entered into executive session to receive "legal advice with regard to the . . . proposed Senate pairings in Anchorage."[208] Upon exiting executive session, Member Marcum immediately moved to accept the Anchorage Senate pairings without further public discussion. The superior court observed:

> This evidences not only secretive procedures, but suggests that certain Board members came to some kind of consensus either during executive session, or altogether outside of the meeting processes. While the Court stops short of a finding that this happened, the Court does see ample evidence of secretive process[es] at play.

---

[207] The superior court's internal citations to the record have been omitted.

[208] We are unable to discern the specific OMA allowance relied upon for the executive session.

The Board emphasizes that on November 8 it extensively discussed possible Senate district pairings on record, including the multiple potential Anchorage Senate district pairings presented by Members Bahnke and Marcum mentioned above. The Board also points to trial testimony from Members Binkley and Simpson that Board members did not agree on the maps during executive session or between public meetings and that the Board entered into executive session on November 8 to receive legal advice about some potential Senate pairings. The Board asserts that this testimony was uncontested at trial.

Yet, as amici curiae Alaska Black Caucus notes: "The Board never discussed the relative merits of Bahnke's plan as compared to Marcum's. No other Board member spoke on record in favor of Marcum's proposal, . . . yet Binkley somehow knew that a majority favored Marcum's plan over Bahnke's." East Anchorage points to other evidence of secretive procedures. It notes Member Borromeo's statements on the record that in executive session the Board likely had been advised *against* the Senate District K pairing and that Member Binkley, despite voting for splitting Muldoon, made no statement on the record supporting the pairings or explaining why he thought they "were more lawful or correct than those proposed by Member Bahnke." East Anchorage also notes that Members Marcum and Simpson, the two members most vocally supporting the Eagle River-Muldoon pairing, "had access to incumbent information" provided by a Republican strategist, Randy Ruedrich.

Bearing in mind that the results of secretive procedures are, by their nature, difficult to prove, and, paradoxically, that habitually using executive session to conduct the Board's business is indicative of secretive procedures, we agree with the superior court that this factor tends to weigh in favor of finding discriminatory intent.

### ii. Partisanship

The superior court found evidence of regional partisanship, another *Kenai*

-90- **7646**

*Peninsula* equal protection discriminatory intent factor.[209] The court framed the issue as favoring Eagle River and disfavoring Muldoon as geographic regions rather than as discriminating against a particular political party. The court stated that although South Muldoon historically was a Republican-leaning swing district, the Senate pairings would "usurp[] [its] voting strength in the event it chooses to elect a Democratic senator." As amici curiae Alaska Black Caucus put it:

> An East Anchorage [S]enate district formed from the two Muldoon [H]ouse districts would be a swing district, with no guarantee that the next senator would be a Democrat rather than a Republican. But this pairing would guarantee that the votes of East Anchorage would matter: voters could elect a senator who resides in the community, who understands its concerns, and who does not need to compromise those concerns . . . to protect the interest of voters in the other half of a district with very different needs.

The Senate District K pairing's political undertones are impossible to ignore. We first must address the Board's contention that we have "never recognized the viability of a partisan gerrymandering claim" and its reliance on *Rucho v. Common Cause* — holding that political gerrymandering claims are non-justiciable in federal courts — to urge us to follow the Supreme Court's lead.[210] Contrary to the Board's contention, we have recognized partisan gerrymandering claims. *Kenai Peninsula* adjudicated a partisan gerrymandering claim that ultimately was dismissed, but not on justiciability grounds.[211] Considering the Constitutional Convention minutes, the 1999 amendments' legislative history, and our case law, we expressly recognize that partisan

---

[209] 743 P.2d at 1372 (setting out multifactor totality of circumstances test).

[210] 139 S. Ct. 2484, 2506-07 (2019).

[211] *See* 743 P.2d at 1369-70.

gerrymandering is unconstitutional under the Alaska Constitution.

There is ample evidence of regional and political partisanship in this case. East Anchorage points out that the Board's 3-2 majority in favor of splitting the Muldoon and Eagle River areas was comprised only of the Republican-appointed Board members. Member Simpson said at trial that, despite article VI, section 8's instruction that Board members be chosen "without regard to political affiliation," he was chosen because he was "a Republican from Southeast."[212] As the superior court acknowledged, Muldoon leans Republican but is a "highly competitive" district, whereas Eagle River is "firmly Republican." East Anchorage notes that Randy Ruedrich, a Republican strategist and

---

[212]    As noted earlier, Member Simpson's post-remand email, not available in the record for this part of our review, shows that he viewed the redistricting process through a partisan lens. *See supra* note 166. The email stated:

> The Supremes also upheld the Superior Court's ruling that we had politically gerrymandered one Senate district in Anchorage . . . . To me this implies that what the court perceived as a political gerrymander must be replaced with a different political gerrymander more to their liking. The district in question paired two [H]ouse districts that were both majority non-minority, one of which was reliably [R]epublican and the other was [R]epublican 2/3 of the time. Not clear to me why this is bad but the D[emocrat]s will push to dilute both of them to make it easier to elect their candidates.

These comments reveal more about the member's views of the propriety of political gerrymandering than about our role in resolving constitutional challenges to a redistricting plan. We decide the redistricting cases brought to us, including the challenges to the current Board's redistricting plans; we do not seek out the redistricting cases we hear. Our past redistricting decisions reflect that the political affiliations of those creating a redistricting plan had no bearing on our decisions. *See, e.g.*, *supra* note 17 (discussing redistricting challenges and our decisions when governors controlled redistricting).

former chair of the Alaska Republican Party, emailed Members Marcum and Simpson "political incumbent information for each of the Board's adopted [H]ouse districts." Ruedrich also appears to be the only person to have testified in favor of pairing Eagle River and Muldoon during the November 8 public comments meeting. There also is Member Marcum's statement that Eagle River would get "more representation" if it were split into two Senate districts, meaning increased Senate representation for Eagle River by controlling two firmly Republican Senate districts rather than one.

Finally, notwithstanding our deferential hard look standard, the Board's justification for pairing a Muldoon House district and an Eagle River House district in the face of overwhelming public opposition from *both* communities is difficult to understand unless some form of regional or political partisanship were involved. And amici curiae Alaska Black Caucus persuasively illustrates how past pairings involving East Anchorage and Eagle River areas resulted in Alaska's first Black female senator — a Democrat — losing her seat, despite having been re-elected multiple times before the pairing. Considering the rushed manner in which the Board adopted the Senate District K pairing, the nearly unanimous public opposition, and the contrasting political effects of the pairing on Muldoon's and Eagle River's voting power, we agree with the superior court that the record supports the inference that partisanship was at play.

### d.     Proportionality of representation

*Kenai Peninsula* instructs that a Senate district drawn with a discriminatory purpose might be justifiable if the Board can show that it led to greater "proportionality of representation."[213]   Equating the concept of proportionality with the degree of deviation from the ideal district population, the superior court invalidated the South Muldoon and Eagle River Senate pairings because it concluded that the Board's plan led

---

[213]     743 P.2d at 1372.

to more population deviation than the challengers' plan.

The Board correctly points out that, when a House district is underpopulated relative to the "ideal" House district population, residents of that district are *over*represented because their voting power is higher relative to residents of districts with higher populations. The Board points out that the superior court got this backward; the court repeatedly referred to House districts with lower populations as *under*represented when it should have called them *over*represented. But this misses the point.

We agree with the superior court that the closer to zero a district's deviation from the ideal population is, the greater the "proportionality of representation" is *in that context*. But in the fair representation context proportional representation is the extent to which members of a particular group are represented in public office.[214] For example, in a hypothetical pairing created specifically to discriminate against Black citizens, the fact that the House districts exactly equaled the ideal district population, rather than deviating from the ideal by a percent or two, would neither be a defense nor serve the interests of justice. *Kenai Peninsula*'s discussion of "proportionality of representation" makes more sense in this context; that proportional representation inquiry concerned over- or under-representation in the State legislature based on Anchorage's share of Alaska's population, not its degree of deviation from the ideal district population.[215] We already have unequivocally stated in *Braun* and *2011 Redistricting I* that Alaskans do not

---

[214] *See Thornburg v. Gingles*, 478 U.S. 30, 74-77 (1986) (discussing proportional representation of Black population in state legislature); *Proportional representation*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An electoral system that allocates legislative seats to each political group in proportion to its actual voting strength in the electorate.").

[215] 743 P.2d at 1372-73.

have an absolute right to proportional representation based on population.[216] And such an inquiry would not make sense in this case. Muldoon and Eagle River area citizens are not scattered across the state, comparable to the Black population in *Thornburg v. Gingles*,[217] but are by definition located in fixed places.

### e. Conclusion

Under the totality of the circumstances, the superior court correctly concluded that Senate District K is unconstitutional due to geographic and partisan gerrymandering. And the appropriate remedy was to remand to the Board to correct the constitutional deficiency.

## V. CONCLUSION OF CHALLENGES TO 2021 PROCLAMATION

We AFFIRM the superior court's determination that House Districts 3 and 4 comply with article VI, section 6 of the Alaska Constitution and should not otherwise be vacated due to procedural aspects of the Board's work. We REVERSE the superior court's remand to the Board for further proceedings on those districts under the superior court's hard look analysis relating to public comments on these House districts.

We AFFIRM the superior court's determination that House Districts 29, 30, and 36 do not violate article VI, section 6 of the Alaska Constitution and should not otherwise be vacated due to procedural aspects of the Board's work, with one exception: We conclude that the so-called "Cantwell Appendage" violates article VI, section 6 because it renders House District 36 non-compact without adequate justification. We therefore REVERSE the superior court's determination to this limited extent.

---

[216] *Braun v. Denali Borough*, 193 P.3d 719, 730 (Alaska 2008); *2001 Redistricting I*, 44 P.3d 141, 144 (Alaska 2002); *accord* Voting Rights Act 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.").

[217] *See generally* 478 U.S. at 74-77.

We AFFIRM the superior court's determination that the Board's Senate District K pairing of House Districts 21 and 22 constituted an unconstitutional political gerrymander violating equal protection under the Alaska Constitution.

## VI. 2021 REDISTRICTING PROCESS AFTER REMAND, ROUND 2: BOARD PROCEDURES AND AMENDED PLAN; CHALLENGE AND SUPERIOR COURT'S DECISION; BOARD'S PETITION FOR REVIEW

The superior court remanded the redistricting plan back to the Board with instructions consistent with our summary order. The superior court ordered, among other things, that the Board correct the constitutional error that both we and the superior court identified with respect to Senate District K.

### A. Board Proceedings On Remand

The Board met and heard public testimony almost every day April 2-9. The Board did not enter into any executive sessions, though the superior court later noted that there were indications Board Members Binkley, Marcum, and Simpson — the three members in favor of the initial Senate District K — may have been privately communicating and formed a coalition with the goal of preserving a JBER/North Eagle River Senate district.

By April 6 the Board was deciding between Options 2 and 3B for Senate district pairings. Option 2 and Option 3B both resulted in four Senate districts different from the original November 2021 plan. Both options paired North and South Muldoon into Senate District K. But where Option 2 would have combined North and South Eagle River into an Eklutna/Eagle River/Chugiak Senate district, Option 3B kept North Eagle River with JBER (Senate District L) and placed South Eagle River with South Anchorage/Girdwood/Whittier (Senate District E). The final amended plan was adopted on April 13 with Members Binkley, Marcum, and Simpson voting in favor of Option 3B and Members Bahnke and Borromeo opposed.

### B. Superior Court Proceedings

Louis Theiss, Ken Waugh, and Jennifer Wingard (collectively Girdwood) appeared in the superior court later in April to challenge Senate District E as violating their equal protection rights and article VI, section 6 because it was non-compact, was "falsely contiguous," and ignored geographic features. Girdwood also contended that again creating two separate Eagle River Senate districts, Districts K and L, constituted unlawful political gerrymandering.[218]

Due to the proceeding's expedited nature — potential legislative candidates had an impending June 1 filing deadline[219] — there was no formal discovery and the superior court held only one day of oral argument, largely working from the parties' briefing. The court "accepted all materials submitted by the parties, regardless of timing" and reviewed them under a more relaxed standard of evidence, considering "their relevance to the issues presented" and affording them weight "under the totality of the circumstances." The superior court issued its decision on May 16. We again commend the superior court on its expedited work resolving the challenges to the Board's plan.

#### 1. Girdwood's article VI, section 6 challenge

Girdwood argued that pairing South Eagle River with South Anchorage/Girdwood/Whittier in Senate District E violated article VI, section 6's "contiguity requirement and disregard[ed] local government boundaries without explanation." Girdwood acknowledged that Senate District E was technically contiguous

---

[218] Attached as Appendix C are copies of relevant election district maps the Board published with its April 2022 amended proclamation. These maps show the contested Senate districts.

[219] AS 15.25.040(a).

— the districts physically touched at the border[220] — but that this was "false contiguity" because "several hundred miles of uninhabited state park, including the Chugach Mountains, divide the actual population centers" of the Senate district. An expert witness for Girdwood, Dr. Chase Hensel, testified about this contiguity requirement, but the superior court discounted the testimony as amounting to an improper legal conclusion. The superior court held that "Senate District E does not violate [a]rticle VI, [section] 6" because the two House districts composing the Senate district share a border, fulfilling the contiguity requirement.

### 2. Girdwood's equal protection challenge

Girdwood next argued that the "Board acted with illegitimate purpose when it adopted Option 3B," violating equal protection. Girdwood pointed to the superior court's prior findings that the Board had engaged in "secret procedures" and contended that the Board's splitting Eagle River voters into two Senate districts was evidence of partisanship gerrymandering; Girdwood argued that the Board continued to have an illegitimate purpose when it again split Eagle River voters into two Senate districts for the amended plan. Girdwood argued that the Board's majority coalition chose to split up communities of interest in contravention of what the majority of public commenters requested and without justification for more proportional representation.

The bulk of the superior court's decision considered whether the new Senate district pairings violated equal protection by intentionally discriminating in favor of or against a community of interest. The court again relied on the *Kenai Peninsula* "neutral factors test" to find that, under the totality of the circumstances, the Board was

---

[220] *See* Alaska Const. art. VI, § 6 ("Each [S]enate district shall be composed as near as practicable of two contiguous [H]ouse districts."); *Hickel v. Se. Conf.*, 846 P.2d 38, 45 (Alaska 1992) (explaining territories are contiguous when they are "bordering or touching" each other).

intentionally discriminating when it engaged in unconstitutional partisan gerrymandering to ensure "two solidly Republican senate seats" in Senate Districts L and E. The court found that the Board ignored the Eagle River and South Anchorage communities of interest when constructing Senate District E because a majority of the Board "insisted continuously" that Senate District L — combining North Eagle River and JBER — "remain intact."

The superior court initially was unsure "how much weight" to afford its March 2021 finding, that the Board had engaged in intentional discrimination when it split Eagle River voters into separate Senate districts, when considering the constitutionality of the Board's amended plan. After reviewing federal case law addressing how to apply prior discriminatory intent in equal protection cases the court concluded that it would look at "the Board's prior discriminatory intent as part of the 'totality of the circumstances' in addressing the Girdwood challenge" but that it would not be dispositive; the burden would remain on Girdwood to prove discriminatory intent.[221]

The superior court then discussed circumstances it found relevant for the Girdwood challenge. Given that the South Anchorage/Girdwood House district is

---

[221] The superior court commented that in light of the Board's prior partisan gerrymandering, the court would be in favor of shifting "the burden to the Board to demonstrate that its Amended Proclamation . . . w[as] made in good faith and without partisan considerations." But the court recognized that there is a presumption of constitutionality and that the Board's actions generally are reviewed under a deferential arbitrary and capricious standard. *See Treacy v. Mun. of Anchorage*, 91 P.3d 252, 260 (Alaska 2004) ("A duly enacted law or rule . . . is presumed to be constitutional."); *Kodiak Island Borough v. Mahoney*, 71 P.3d 896, 899-900 (Alaska 2003) (reasoning that rules or laws created by bodies with rulemaking or lawmaking powers conferred directly by Constitution are entitled to presumption of constitutionality); *Kenai Peninsula*, 743 P.2d at 1357-58. The court utilized the deferential arbitrary and capricious standard of review for the Board's amended plan.

Republican-leaning already, the court first noted that South Anchorage's pairing with a strong Republican district would not "necessarily result in any significant discriminatory effect." Second, the court found that the Board's prior act of pairing South Eagle River with South Muldoon to "give[] Eagle River more [Senate] representation" "weigh[ed] heavily in Girdwood's favor." Third, the court concluded that the Board's main rationale for ignoring "public testimony, geography, and even the boundaries of Eagle River to justify adopting Option 3B" — " 'to preserve the military community's voting strength' as a 'community of interest' " — was not supported by the record (when the court had never found that JBER was a community of interest) and constituted "substantive departures . . . weighing heavily in Girdwood's favor." Fourth, the court found that "contemporaneous statements of the decision-makers" were inconclusive regarding discriminatory intent. "Ultimately, the factor that tip[ped] the balance in Girdwood's favor [was the superior court's] prior finding on intent."

The superior court discussed the Board's primary justification for selecting Option 3B: "[P]airing JBER with downtown Anchorage would result in JBER's preference for candidates being usurped by downtown Anchorage's preference for opposing candidates." But because the court was not given evidence supporting that JBER was a community of interest and the Board failed to engage with comments pointing out that the large, demographically diverse "portion of Downtown" paired with JBER in House District 23 would not be served by the Senate District L pairing, the court found that the Board had "not put forth any legitimate, nondiscriminatory purpose for its actions" and thus "violated equal protection rights of the residents of Girdwood and House District 9." The court also found that "the majority of the Board acted in concert with at least a tacit understanding that Eagle River would again be [split and] paired in such a way as to provide it with two solidly Republican senate seats — an unconstitutional partisan gerrymander." Thus, under the totality of the circumstances,

the court concluded "that the Board intentionally discriminated against residents of District 10, including Girdwood[,] in order to favor Eagle River, and this intentional discrimination had an illegitimate purpose" violating equal protection.

The superior court remanded the proceedings to the Board to draft a constitutional plan and also ordered "the Board to adopt Option 2 on an *interim* basis for the 2022 general election."

### C. The Board's Petition For Review

The Board petitioned for our review of the superior court's May 2022 order, challenging both the basis for remand and the court's imposed interim plan. We granted review, later issuing a summary order resolving the petitions and noting that a full explanation would follow.[222]

## VII. RESOLUTION OF ROUND 2 PETITION FOR REVIEW

### A. The Superior Court Did Not Improperly Consider The Weight Of The Public's Testimony.

The Board argues that the superior court "recycled [its] weight-of-public-testimony standard" which had been effectively struck down by our March 25, 2022 order. The Board is correct that we struck down the court's earlier hard look analysis and that the court continued to express concern about the weight of the public testimony regarding the amended plan. But the Board fails to recognize that the court expressly acknowledged our earlier order and noted the weight of the public testimony only in light of our pending full opinion. The court appears to have landed on the appropriate hard look analysis we discussed above: Public comment should be considered when it raises a salient issue that the Board should address if it is engaging in reasoned decision-

---

[222] Our summary order resolving the petition for review is attached as Appendix D.

making.[223]

The Board does not argue that the superior court's discussion of public testimony impacted any particular step in its decision to remand the amended plan — the Board appears to understand the immense value of public testimony in the decision-making process, extensively quoting public comments in its petition for review — and asks us only to "remind lower courts that public testimony cannot change the . . . requirements of the Alaska Constitution." We do not further address this issue.

## B. The Superior Court Correctly Concluded That The Senate District Pairings Continued To Violate Equal Protection.

### 1. The superior court did not adopt a new burden of proof from federal case law.

The Board contends that the superior court adopted a new burden of proof. The Board seems to suggest that the court adopted a federal standard placing the burden on the Board to prove it did not violate equal protection, despite federal case law instructing courts to impose a "presumption of legislative good faith" in these circumstances.[224] But the court affirmatively asserted that it did "not chang[e] the standard or the burden of proof." Rather, the court highlighted that perhaps a new

---

[223] *See 2001 Redistricting I*, 44 P.3d 141, 144 n.5 (Alaska 2002) (determining whether regulation is reasonable primarily concerns whether "the [Board] has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making" (quoting *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001))).

[224] *See Abbott v. Perez*, 138 S. Ct. 2305, 2311 (2018) ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination, which is but 'one evidentiary source' relevant to the question of intent." (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977))). We note that the Board quotes a different portion of *Abbott* in which it is less obvious that past discrimination is one factor relevant to the analysis of present discriminatory intent.

approach was warranted given our previous rejection of gerrymandering in this redistricting cycle, and the court left the matter for us to decide whether the burden of proof should be adjusted in comparable future scenarios. The Board's argument, as we said in our earlier order, is specious.[225]

The Board also challenges the superior court's subsequent review of federal case law when determining that it should include its earlier finding that the Board engaged in unconstitutional political gerrymandering in conducting its *Kenai Peninsula* neutral factors test.[226] We see no error in the court's analysis and agree that prior acts of discrimination by the same Board in the same redistricting cycle are relevant under the *Kenai Peninsula* neutral factors test.[227]

### 2. The superior court did not improperly distinguish our holding in *2001 Redistricting I.*

The Board argues that, because two decades ago we upheld a House district combining the Eagle River Valley with South Anchorage, the superior court erred when it allegedly "ignored this dispositive holding and never distinguished it."[228] The Board does not suggest that it made this argument to the superior court, does not point to

---

[225] *See infra* Appendix 2.

[226] *See* 743 P.2d at 1372.

[227] *See id.*; Alaska R. Civ. P. 90.8(d) (explaining that record before superior court in redistricting challenges "consists of the record from the Redistricting Board"); *cf. Abbott*, 138 S. Ct. at 2313, 2317, 2324-25 (holding 2013 election map that looked similar to unconstitutional 2011 map necessitated new finding of discriminatory intent because different legislature created new map).

[228] *See 2001 Redistricting II*, 47 P.3d 1089, 1091 (Alaska 2002) (holding House district that did not follow "natural and local government boundaries" was not automatically unconstitutional on grounds of socioeconomic integration or other article VI, section 6 concerns).

-103-                                                            7646

anywhere in the order following remand where the court wrestled with this concern, and does not point to any case law suggesting that approvals of prior redistricting plans have a preclusive effect on subsequent plans.

The Board appears to be making a stare decisis argument, which intuitively would be irrelevant in the redistricting context because each new redistricting cycle naturally entails new circumstances in light of new census data.[229] Otherwise, every ten years the Board presumptively would be able to adopt the proclamation from the last redistricting cycle and the burden would be on voters to argue why any deviations would be justified.[230] It also is important to consider whether a particular constitutional requirement was at issue and litigated in the previous redistricting cycle; the Board does not assert that partisan gerrymandering was a disputed issue we resolved. We reject the Board's argument.

### 3. The superior court did not err in its discussion of communities of interest.

The superior court critically reviewed the Board's assertion that military residents of JBER necessarily constitute a community of interest. The Board argues that the court's critique was erroneous because the court never defined community of interest;

---

[229] *Cf. Thomas v. Anchorage Equal Rts. Comm'n*, 102 P.3d 937, 943 (Alaska 2004) ("The stare decisis doctrine rests on a solid bedrock of practicality: ' "no judicial system could do society's work if it eyed each issue afresh in every case that raised it." ' " (quoting *Pratt & Whitney Canada, Inc. v. United Techs.*, 852 P.2d 1173, 1175 (Alaska 1993))).

[230] *See id.* ("In recognizing the importance of this doctrine, we have consistently held that a party raising a claim controlled by an existing decision bears a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling: 'We will overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent.' " (quoting *State, Com. Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003))).

"obvious[ly] . . . military personnel share the same employer, the same noble mission, the same workplace, and the same shopping and medical facilities"; and " 'communities of interest' is a synonym for areas that are socio-economically integrated," such that "Eagle River and South Anchorage are not separate communities of interest that cannot be combined with other areas of Anchorage and cannot be split." The Board's argument somewhat misrepresents the court's discussion. The court did not find that JBER was *not* a community of interest; rather the court pointed out that JBER previously had not been identified as a community of interest and found that the Board failed to present any evidence supporting its assertion. And the crux of the issue before us is not whether separate communities of interest can be combined, but whether a community of interest can be split to its own advantage (and to the disadvantage of separate communities of interest) by allowing it to control multiple Senate districts.

We note again, as we did when resolving the Board's earlier petition for review, that the Board's assertion that communities of interest are equivalent to socioeconomically integrated communities is incorrect. A community of interest almost always will be socioeconomically integrated within itself and externally with other nearby communities of interest, but a larger socioeconomically integrated community is not automatically an all-encompassing community of interest.[231] The Board cited no evidence, aside from its own speculation, that JBER is a community of interest; in any case, there was no showing that the House district encompassing the populated portion of the military base as a whole would tend to share political preferences more closely with an Eagle River House district than with the downtown Anchorage House district. We thus reject the Board's argument that concerns about JBER justify splitting Eagle River.

---

[231] *See* Stephanopoulos, *supra* note 198, at 1430.

### 4. The superior court's discussion of local government boundaries was not erroneous.

The superior court acknowledged that the disputed House districts were within the Municipality of Anchorage and therefore were socioeconomically integrated as a matter of law, but criticized the Board for not considering "local [government] boundaries, including school zones, community councils and even the Downtown Improvement District" when drawing the new senate map. The Board asserts that "high school attendance boundaries within the Anchorage School District are not 'local government boundaries' because all students within the Anchorage School District are governed by the same political entity: the Anchorage School District School Board."[232] The Board also asserts that "community council boundaries within the Municipality of Anchorage are of *no constitutional import*." (Emphasis in original.) In *2001 Redistricting II* we recognized that "respect for neighborhood boundaries is an admirable goal"; we then held that "it is not constitutionally required and must give way to other legal requirements."[233] Although districting along "neighborhood boundaries" is not "constitutionally required,"[234] it is an unconvincing stretch for the Board to argue that

---

[232] The Board makes a frivolous argument that "[n]othing in the state [C]onstitution or case law suggests that the Board must consider where non-voting minor children go to school when the Board adopts legislative districts for adult voters." The court was, of course, not considering school zones because children going to the same school might have similar voting interests, but rather because those students tend to have concerned parents and guardians who could be unified by issues surrounding the fact that their children attend the same schools. It does not seem unreasonable that "local government boundaries" might include school zones. Alaska Const. art. VI, § 6.

[233] 47 P.3d at 1091.

[234] *Id.*

they are of "no constitutional import."[235] (Emphasis omitted.) And the Board identifies no "legal requirements" that convinced it to forgo considering community boundaries.

Girdwood responds that public comments demonstrate the Board's justification for pairing JBER with North Eagle River — recognizing JBER as a military community of interest better paired with Eagle River's military community — was pretextual. Girdwood also points to numerous local governing entities' comments tending to oppose the Eagle River area split. For example, the Anchorage Downtown Community Council (DCC) adopted a resolution requesting that House District 23 (containing JBER) be paired with now-House District 19 (part of downtown Anchorage). DCC suggested that splitting up the "downtown core" by pairing JBER's district with Eagle River continued to promulgate the "unconstitutional problem" from the plan previously struck down. Girdwood argues that the Board disregarded, and perhaps did not even read, these comments given members' statements indicating they did not grasp that JBER was placed in a House district with portions of downtown Anchorage. These public comments and local government resolutions rise to the level of "salient issues" that the Board should have addressed if it were taking a hard look at Senate redistricting.[236]

---

[235] *See* Alaska Const. art. VI, § 6 ("Each [S]enate district shall be composed as near as practicable of two contiguous [H]ouse districts. Consideration may be given to local government boundaries.").

[236] *See supra* note 223 and accompanying text.

**5.** **The superior court did not err when it applied the *Kenai Peninsula* neutral factors test and concluded that Senate Districts E and L constituted an unconstitutional political gerrymander.**

The superior court relied on *Kenai Peninsula*'s neutral factors test to conclude that, under the totality of the circumstances, the Board intentionally discriminated when it unconstitutionally engaged in partisan gerrymandering to ensure "two solidly Republican [S]enate seats" in Senate Districts E and L. The Board contends that the court "disregarded the neutral factors test because [the test] did not allow [the court] to reach the desired result."

Rather than engaging with the entire *Kenai Peninsula* neutral factors test, the Board primarily emphasizes its more open procedures on remand and its stated rationale for pairing JBER with Eagle River. The Board points out that the court credited the Board for holding transparent meetings with ample public testimony. And, although continuing to oppose the court's emphasis on the weight of the public testimony, the Board nevertheless emphasizes public testimony favoring pairing JBER with Eagle River. The Board says it was concerned, at least in part, about minimizing the voices of the JBER area military members and veterans by pairing it with downtown Anchorage. The Board also notes that Members Bahnke and Borromeo acknowledged some similarities between Eagle River and JBER, despite voting against the pairing.

Girdwood responds that the superior court properly considered "the Board's disregard for the public testimony in context, and concluded that it was *further* evidence of illegitimate intent." (Emphasis in original.) Girdwood points to examples of Board members seeming not to have taken public comments seriously and even being confused after several days of public testimony about where "Chugiak and the Chugach mountains . . . were geographically located relative to Eagle River." Girdwood asserts that this evidence supports the court's findings that "the majority board members approached the

-108- 7646

process with a predetermined outcome in mind," that the "totality of the circumstances indicate[d] a goal-oriented approach[,] [and that] they paid attention to the details only as much as they needed to say the right words on the public record when explaining their choice." We agree.

After the superior court found that the Board intentionally discriminated against certain voters, the burden switched to "the Board to demonstrate that its acts aimed to effectuate proportional representation."[237] The Board appears to suggest that its actions were justified because Girdwood's voting power increased by 0.17% when paired with District 10 as opposed to being paired with District 13 (if Option 2 had been adopted). Aside from this being a de minimis increase in voting power for Girdwood and not being directly relevant to the proportionality of representation issue as we discussed earlier, the Board omits any discussion of discriminating in Eagle River's favor with the aim of "effectuat[ing] proportional representation" in some other way.[238] Absent such justification, we agree with the superior court that continuing to divide the Eagle River area solely "to provide it with two solidly Republican [S]enate seats" constituted "an unconstitutional partisan gerrymander" violating our equal protection doctrine.

## C. The Superior Court Did Not Err When It Ordered As An Interim Plan The Only Other Alternative Considered By The Board.

The Board had adopted two potential redistricting plans for public presentation and comment and for adoption as the final amended plan, Options 2 and 3B. The Board adopted Option 3B as its final amended plan. After deciding Option 3B was unconstitutional, the superior court ordered that the Board implement Option 2 as the upcoming 2022 elections interim plan, enabling legislative candidates to file for office

---

[237]    *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1372 (Alaska 1987).

[238]    *See id.*

by the June 1 deadline. Because we agree with the superior court that the Board's final amended plan — Option 3B — is unconstitutional, the issue of an interim plan remains.

The Board seemingly argues that the superior court had no authority to order the Board to adopt Option 2 as the interim proclamation plan. But the Board must have believed Option 2 fulfilled constitutional requirements, or it would not have adopted the plan for public presentation and consideration. At no point during its public discussion of the two options did a Board member assert that Option 2 was unconstitutional. We issued our May order about a week before June 1, and the Board had made no known effort to prepare or present to us another interim plan.[239] We therefore affirm the superior court's order that the Board adopt the Option 2 proclamation plan as the interim plan for the 2022 elections.

## VIII. CONCLUSION OF ROUND 2 CHALLENGES TO AMENDED PROCLAMATION

We AFFIRM the superior court's determination that the Board again engaged in unconstitutional partisan gerrymandering to increase one group's Senate district voting power at the expense of others. Under the specific circumstances of these proceedings, we AFFIRM the superior court's order that the Board adopt the Option 2 proclamation plan as an interim plan for the 2022 elections.

## IX. FINAL REMEDY

After the second remand, the Board adopted the Option 2 proclamation plan as the 2022 elections interim plan.[240] The question of a final redistricting plan for the

---

[239] *Cf. 2011 Redistricting I*, 274 P.3d 466, 468-69 (Alaska 2012) (inviting Board to submit proposed interim plan for our approval in light of upcoming election deadlines when remanding final plan to Board for further proceedings).

[240] Attached as Appendix E are copies of relevant election district maps the Board published with its May 2022 interim redistricting plan proclamation.

decade remains. Having concluded that the Board engaged in unconstitutional gerrymandering in its initial final redistricting plan and that the Board then did so again in its amended final redistricting plan, our remanding for yet another redistricting plan may be questioned. Indeed, by clear implication article VI, section 11 authorizes courts to mandate a redistricting plan when, after a remand, the Board develops a new plan that is declared invalid.[241] But we will remand out of respect for the Board's constitutional role in redistricting.

Given that the Board adopted the current interim redistricting plan for its final plan deliberations — confirming the Board's belief that the interim plan is constitutional — and given that Alaska's voters have not had a chance to raise challenges to that plan in the superior court:

We REMAND for the superior court to order that the Board shall have 90 days to show cause why the interim redistricting plan should not be the Board's final redistricting plan for the 2020 redistricting cycle:

A.      Upon a showing by the Board of good cause for a remand, the superior court shall REMAND to the Board for another round of redistricting efforts; or

B.      Absent a showing by the Board of good cause for a remand, the superior court shall direct the Board to approve the interim redistricting plan as its final redistricting plan, allowing any legal challenges to that plan to be filed in superior court in the normal course.

---

[241]      *See* Alaska Const. art. VI, § 11 ("Upon a final judicial decision that a plan is invalid, the matter shall be returned to the [B]oard for correction and development of a new plan. If that new plan is declared invalid, the matter *may* be referred again to the [B]oard." (Emphasis added.)).

EASTAUGH, Senior Justice, concurring.

I agree in full with the court's resolution of these disputes. But I write separately because I have doubts about whether *Hickel v. Southeast Conference*[1] correctly described the priorities and order for applying the contiguity, compactness, and socio-economic integration criteria.[2] If I were reading the constitution in a vacuum, I would not necessarily conclude that the delegates agreed or that the Alaska Constitution's text requires that the first two criteria should have priority over the third. But there was no challenge to *Hickel*'s description of those priorities in this case, nor any contention its description should not be given stare decisis effect. Moreover, my doubts do not affect the outcome of any of the issues before us, even as to the "Cantwell Appendage," because the asserted increase in socio-economic integration in House District 36 does not outweigh the diminution in that district's compactness.

---

[1]     846 P.2d 38, 62 (Alaska 1992).

[2]     *See id.* at 44-47, 62 (describing priorities and order for applying contiguity, compactness, and socio-economic integration criteria). The court's opinion today at page 53 quotes the *Hickel* passage that I find problematic.



# 2021 Board Proclamation Statewide

Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

Appendix A

Page 1 of 11

**7646**



## 2021 Board Proclamation Southeast

Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

7646



# 2021 Board Proclamation District 3-B

Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

Appendix A

Page 3 of 11

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

**7646**





## 2021 Board Proclamation District 29-O

Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

Appendix A

Page 5 of 11

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

7646



## 2021 Board Proclamation District 36-R
Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

Appendix A

Page 6 of 11

**7646**



# 2021 Board Proclamation Fairbanks
### Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

34-Q

33-Q

32-P

31-P

35-R

36-R

Fairbanks North Star

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

**7646**



# 2021 Board Proclamation Anchorage
### Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

22-K

9-E

21-K

20-J

18-I

23-L

19-J

12-F

11-F

17-I

14-G

13-G

10-E

15-H

Matanuska-Susitna
30-O

Anchorage 16-H

Kenai Peninsula
8-D

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

Appendix A

7646



## 2021 Board Proclamation Eagle River
Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

30-O

Matanuska-Susitna

24-L

22-K

Anchorage

23-L

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

**7646**



**22-K**

**21-K**

**20-J**

**19-J**

**18-I**

**12-F**

Anchorage

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

Appendix A

7646



# 2021 Board Proclamation District 22-K

Redistricting Plan Adopted by the Alaska Redistricting Board 11/10/2021

24-L

24-L

22-K

Anchorage

22-K

Cumulus Rd

Woll Dr

Hiland Rd

Birdsong Dr

Ski Bowl Rd

Arctic Valley Rd

23-L

20-J

21-K

12-F

11-F

9-E

Appendix A

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

7646

# In the Supreme Court of the State of Alaska

**In the Matter of the 2021 Redistricting Cases,**
(Matanuska-Susitna Borough, S-18328)
(City of Valdez, S-18329)
(Municipality of Skagway, S-18330)
(Alaska Redistricting Board, S-18332)

Trial Court Case No. 3AN-21-08869CI

Supreme Court No. **S-18332**

**Order**
Petitions for Review

Date of Order: **3/25/2022**

Before: Winfree, Chief Justice, Borghesan and Henderson, Justices, and Matthews and Eastaugh, Senior Justices.[*]
Eastaugh, Senior Justice, concurring.

On February 15, 2022 the superior court remanded the underlying redistricting case to the Alaska Redistricting Board for further proceedings on House Districts 3 and 4 and Senate District K of the 2021 Proclamation of Redistricting.[1] We now have before us four petitions for review arising from that decision: by the Board, the Municipality of Skagway Borough, the Matanuska-Susitna Borough, and the City of Valdez (with qualified voters joining the municipality petitions).[2] Because a redistricting matter has priority over all other matters pending before this court,[3] and because a decision in this redistricting

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

[1] *See generally* Alaska Const. art. VI (providing for creation of Redistricting Board, redistricting process leading to redistricting proclamation, and challenges to proclamation in superior court and then this court).

[2] *See* Alaska R. App. P. 216.5(h) (providing for petitions for review of superior court decision remanding redistricting case to the Redistricting Board).

[3] *See* Alaska Const. art. VI, § 11 (providing that redistricting matter "shall have priority over all other matters pending before the . . . court"); Alaska R. App. P. 216.5(i) (same).

Appendix B          Page 1 of 7

**7646**

matter is required by April 1,[4] the parties followed an expedited briefing schedule for fully briefed petitions due by March 2 and fully briefed responses due by March 10. We then held oral arguments on the petitions on March 18. Having considered the parties' briefing and oral arguments, we GRANT review under all four petitions.[5] To now further expedite the redistricting process, we set out in summary fashion our decisions on the merits of the four petitions, with a formal opinion explaining our reasoning to follow:

### House Districts 3 and 4

House Districts 3 and 4 are the subject of two petitions, one by the Board and one by the Municipality of Skagway Borough. We AFFIRM the superior court's determination that the house districts comply with article VI, section 6 of the Alaska Constitution[6] and should not otherwise be vacated due to procedural aspects of the Board's

---

[4]    *See* Alaska R. App. P. 216.5(i) (providing that appellate decisions in redistricting challenges be decided no later than 60 days before statutory filing deadline for next statewide election).

[5]    Alaska Appellate Rule 403(a)-(g) governs petitions for review and generally contemplates a process of a party petitioning for review of a trial court ruling, describing why the ruling is incorrect and why immediate review is necessary, and opposing parties then filing responses; the appellate court has an opportunity to consider whether immediate review is warranted and may order full briefing and oral argument on legal issues presented if appropriate. Given the expedited and weighty nature of redistricting matters, we allowed full briefing on the merits of the parties' challenges and the opportunity for oral argument before we considered whether to grant review. We thank the parties, their attorneys, and amici curiae for their excellent presentation of the arguments in such an expedited fashion. We recognize this was no easy feat.

[6]    Article VI, section 6 instructs:

The Redistricting Board shall establish the size and area of house districts, subject to the limitations of this article. Each

**7646**

work. We REVERSE the superior court's remand to the Board for further proceedings under the superior court's "hard look" analysis relating to public comments on the house districts. There is no constitutional infirmity with House Districts 3 and 4 and no need for further work by the Board.

### House Districts 29, 30, and 36

The Matanuska-Susitna Borough and the City of Valdez separately challenge the superior court's determination that House Districts 29, 30, and 36 do not violate article VI, section 6 of the Constitution and should not otherwise be vacated due to procedural aspects of the Board's work. We AFFIRM the superior court's determination, with one exception: We conclude that the so-called "Cantwell Appendage" violates article VI, section 6 of the Constitution. The Cantwell Appendage renders House District 36 non-compact without adequate justification. House District 36 reaches across a local borough boundary, within which voters are by law socio-economically integrated with other borough voters,[7] to extract Cantwell residents from District 30 and place them in House District 36,

---

house district shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area. Each shall contain a population as near as practicable to the quotient obtained by dividing the population of the state by forty. Each senate district shall be composed as near as practicable of two contiguous house districts. Consideration may be given to local government boundaries. Drainage and other geographic features shall be used in describing boundaries wherever possible.

[7]     *See* AS 29.05.031(a)(1) (requiring "social, cultural, and economic" integration before area may be incorporated as borough or unified municipality); *In re 2001 Redistricting Cases*, 44 P.3d 141, 146 (Alaska 2002) (recognizing same); *Hickel*

**7646**

based primarily on the proposition that an apparent minority of Cantwell residents — shareholders of the Alaska Native Claims Settlement Act regional corporation headquartered in House District 36 — are more socio-economically integrated with similar shareholder residents in House District 36. But the Board's briefing about House Districts 3 and 4 argues: "Nothing in [article VI, section 6] states that the Board should disregard compactness to increase an already socio-economically integrated area's integration."[8] The Board mentions in its briefing that House District 30 was about 2% overpopulated and that moving the roughly 200 Cantwell residents eliminated about half the overage to the constitutionally targeted house district population of 18,335. This rendered both House Districts about 1% overpopulated. But House District 30's approximately 2% overpopulation with the Cantwell residents included, and House District 36's nearly perfect population without the Cantwell residents included, are well within constitutionally allowable parameters under our case law.[9] We therefore REVERSE the superior court's

---

*v. Se. Conf.*, 846 P.2d 38, 51-52 (Alaska 1992) (recognizing same).

[8]     *Cf. Hickel*, 846 P.2d at 62 ("The requirements of article VI, section 6 shall receive priority *inter se* in the following order: (1) contiguousness and compactness, (2) relative socioeconomic integration, (3) consideration of local government boundaries, (4) use of drainage and other geographic features in describing boundaries."). At oral argument the Board asserted that there is no required priority among the constitutional requirements of article VI, section 6 and that the Board has broad discretion to balance those requirements. The Board did not acknowledge this aspect of *Hickel* nor did the Board suggest anywhere in its briefing or during oral argument that *Hickel* was wrongly decided or that our long-standing precedent should be overruled.

[9]     The federal "Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable," though some deviation is expected and permissible.

determination to this limited extent, and remand to the superior court to remand this aspect of the house districts to the Board to correct the constitutional error.

### Senate District K

The superior court determined that Senate District K was unconstitutional on the grounds of equal protection,[10] due process,[11] and violating the public hearings

---

*Reynolds v. Sims*, 377 U.S. 533, 577, 579-81 (1964); U.S. Const. amend. XIV, § 1. For example, keeping political subdivisions, such as boroughs, intact may justify some population deviation. *Reynolds*, 377 U.S. at 580-81.

We previously have held that under the Alaska Constitution deviations below 10% were minimal and required no justification absent improper motive. *See Hickel*, 846 P.2d at 47-48; *cf. Braun v. Borough*, 193 P.2d 719 (2008) (analyzing deviation in borough redistricting context). Although technological advances often will make it practicable to achieve even lower deviations, and under the Alaska Constitution the Board must make a good faith effort to do so, *see In re 2001 Redistricting Cases*, 44 P.3d at 146, we have upheld deviations greater than 1%, *see In re 2001 Redistricting Cases*, 47 P.3d 1089, 1094 (Alaska 2002). Eliminating the Cantwell Appendage would improve the compactness of District 36 and keep together voters in the same borough in District 30, and there is no showing that doing so would have more than a de minimis effect on the statewide House Districts' average population deviation. The resulting roughly 2% population deviation in District 30 thus is justified.

[10] *See* Alaska Const. art. I, § 1; *Kenai Peninsula*, 743 P.2d at 1366 ("In the context of voting rights in redistricting and reapportionment litigation, there are two basic principles of equal protection, namely that of 'one person, one vote' — the right to an equally weighted vote — and of 'fair and effective representation' — the right to group effectiveness or an equally powerful vote." (quoting John R. Low-Beer, *The Constitutional Imperative of Proportional Representation*, 94 YALE L.J. 163, 163-64 (1984))).

[11] *See* Alaska Const. art. I, § 7; *Haggblom v. City of Dillingham*, 191 P.3d 991, 995 (Alaska 2008) ("At a minimum, due process requires that the parties receive notice and an opportunity to be heard.").

**7646**

requirement.[12] The Board challenges this determination. We note that the superior court did not rule that the underlying house districts were unconstitutional and that no party asserts that the underlying house districts are unconstitutional. The superior court's determination relates solely to the senate pairing of house districts.[13] We AFFIRM the superior court's determination that the Board's Senate K pairing of house districts constituted an unconstitutional political gerrymander violating equal protection under the Alaska Constitution,[14] and we therefore AFFIRM the superior court's remand to the Board to correct the constitutional error.

### Conclusion

This matter is REMANDED to the superior court for action consistent with this order. We do not retain jurisdiction.

Entered at the direction of the court.

---

[12]     *See* Alaska Const. art. VI, § 10 ("Within thirty days after the official reporting of the decennial census of the United States or thirty days after being duly appointed, whichever occurs last, the board shall adopt one or more proposed redistricting plans. The board shall hold public hearings on the proposed plan, or, if no single proposed plan is agreed on, on all plans proposed by the board.").

[13]     *See* Alaska Const. art. VI, § 4 (requiring Redistricting Board to create 40 separate house districts and 20 senate districts, each composed of two house districts).

[14]     *See Hickel*, 846 P.2d at 45 & n.11 (explaining Constitution's contiguity, compactness, and socio-economic integration requirements "were incorporated by the framers of the reapportionment provisions to prevent gerrymandering," including political gerrymandering); *In re 2011 Redistricting Cases*, 274 P.3d 466, 468 (Alaska 2012) ("The *Hickel* process also diminishes the potential for partisan gerrymandering and promotes trust in government.").

7646

Clerk of the Appellate Courts

_____

Meredith Montgomery

EASTAUGH, Senior Justice, concurring.

I agree in full with the court's resolution of these petitions. But I write separately because I have doubts about whether *Hickel v. Southeast Conference*[1] correctly described the priorities for applying the contiguity, compactness, and socio-economic integration criteria.[2] If I were reading the constitution in a vacuum, I would not necessarily conclude that the delegates agreed or that the Alaska Constitution's text requires that the first two criteria should have priority over the third. But there was no challenge to *Hickel*'s description of those priorities in this case, nor any contention its description should not be given stare decisis effect. Moreover, my doubts do not affect the outcome of any of these petitions, even as to the "Cantwell Appendage," because the asserted increase in socio-economic integration in House District 36 does not outweigh the diminution in that district's compactness.

---

[1] 846 P.2d 38, 62 (Alaska 1992).

[2] *See id.* at 44-47, 62 (describing priorities for applying contiguity, compactness, and socio-economic integration criteria).

7646



Redistricting Plan Adopted by the Alaska Redistricting Board 04/13/2022

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

Appendix C

Page 1 of 3

7646



## April 2022 Board Proclamation Eagle River
Redistricting Plan Adopted by the Alaska Redistricting Board 04/13/2022

10-E

24-L

Matanuska-Susitna

30-O

Anchorage

23-L

Appendix C

Page 2 of 3

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

7646



## April 2022 Board Proclamation Anchorage
Redistricting Plan Adopted by the Alaska Redistricting Board 04/13/2022

Appendix C

Page 3 of 3

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

7646

# In the Supreme Court of the State of Alaska

| | |
|---|---|
| **In the Matter of the 2021 Redistricting Cases** (Alaska Redistricting Board/Girdwood Plaintiffs/East Anchorage Plaintiffs) | Supreme Court No. **S-18419** |
| | **Order** |
| | Petition for Review |
| | Date of Order: **5/24/2022** |
| Trial Court Case No. **3AN-21-08869CI** | |

Before:  Winfree, Chief Justice, Borghesan and Henderson, Justices, and Matthews and Eastaugh, Senior Justices.[*]

On February 15, 2022 the superior court remanded the 2021 Proclamation of Redistricting to the Alaska Redistricting Board for further proceedings on, *inter alia*, the Board's proposed Senate District K.[1] After considering four petitions for review[2] on an expedited basis[3] we issued an order affirming the superior court's conclusion that Senate District K was an unconstitutional political gerrymander and remanding to the

---

[*]  Sitting by assignments made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

[1]  *See generally* Alaska Const. art. VI (providing for creation of redistricting board, redistricting process leading to redistricting proclamation, and challenges to proclamation in superior court and then this court).

[2]  *See* Alaska R. App. P. 216.5(h) (providing for petitions for review of superior court decision remanding redistricting case to the Redistricting Board).

[3]  *See* Alaska Const. art. VI, § 11 (providing that redistricting matter "shall have priority over all other matters pending before the . . . court"); Alaska R. App. P. 216.5(i) (same).

7646

superior court to remand to the Board for further proceedings to correct the unconstitutional proclamation plan.[4]

After remand the Board approved an amended proclamation plan on April 13, 2022. The amended plan was challenged in superior court by both the original East Anchorage Plaintiffs and three Alaska residents referred to as the Girdwood Plaintiffs. On May 16, 2022 the superior court decided, in relevant part, that the Board's Senate Districts E and L were a continuing unconstitutional political gerrymander, that the matter be remanded to the Board to correct the constitutional deficiency, and that the Board adopt a specified interim proclamation plan for the 2022 elections in light of the upcoming June 1 candidate filing deadline and the inability to have a new final proclamation plan approved before that date.[5]

The Board petitioned for review of the superior court's decision, challenging both the ruling on the amended proclamation plan's unconstitutionality and the specified interim plan for the 2022 elections. As with the earlier petitions for review, we ordered expedited briefing;[6] we also entered a stay of the superior court's May 16, 2022 order pending further order of this court.[7]

---

[4]   *In re 2021 Alaska Redistricting Cases*, No. S-18332 (Alaska Supreme Court Order, March 25, 2022).

[5]   *See* AS 15.25.040(a) (setting date for candidate filings).

[6]   *In re 2021 Alaska Redistricting Cases*, No. S-18419 (Alaska Supreme Court Order, May 18, 2022).

[7]   *In re 2021 Alaska Redistricting Cases*, No. S-18419 (Alaska Supreme Court Order, May 19, 2022).

7646

Having considered the parties' briefing, we GRANT review of the Board's petition.[8] To now further expedite the redistricting process, and without seeing the need for oral argument, we set out in summary fashion our decision on the Board's petition for review with a formal opinion explaining our reasoning to follow:

**Overview**

As presented to us for appellate review, this matter does not involve a challenge to the Board's compliance with article VI, section 6 of the Alaska Constitution.[9] Nor does this matter involve a claim of improper house district population

---

[8] Alaska Appellate Rule 403(a)-(g) governs petitions for review and generally contemplates a process of a party petitioning for review of a trial court ruling, describing why the ruling is incorrect and why immediate review is necessary, and opposing parties then filing responses; the appellate court has an opportunity to consider whether immediate review is warranted and may order full briefing and oral argument on legal issues presented if appropriate. Given the expedited and weighty nature of redistricting matters, we allowed full briefing on the merits of the Board's challenges to the superior court's order in about two days' time for each side. We thank the parties and counsel for their cogent presentation of arguments in such an expedited fashion.

[9] Article VI, section 6 instructs:

> The Redistricting Board shall establish the size and area of house districts, subject to the limitations of this article. Each house district shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area. Each shall contain a population as near as practicable to the quotient obtained by dividing the population of the state by forty. Each senate district shall be composed as near as practicable of two contiguous house districts. Consideration may be given to local government boundaries. Drainage and other geographic features shall be used in describing boundaries wherever possible.

7646

deviations.[10] The issue before us is whether the Board's pairing of certain house districts in senate districts[11] violates the Alaska Constitution's equal protection guarantee, specifically the right to fair and effective representation.[12]

**Senate Districts E and L**

The superior court concluded that the Board's amended proclamation plan reflected the Board's continued intent to discriminate — on a partisan basis — in favor of Eagle River voters by selectively pairing two Eagle River house districts with non-Eagle River house districts, giving Eagle River voters an opportunity to elect two senators in Senate Districts E and L, to the detriment of voters in the non-Eagle River

---

*See Hickel v. Se. Conf.*, 846 P.2d 38, 45 & n.11 (Alaska 1992), *as modified on denial of reh'g* (Mar. 12, 1993) (explaining Constitution's contiguity, compactness, and socio-economic integration requirements "were incorporated by the framers of the reapportionment provisions to prevent gerrymandering," including political gerrymandering).

[10] The federal "Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable," though some deviation is expected and permissible. *Reynolds v. Sims*, 377 U.S. 533, 577, 579-81 (1964); U.S. Const. amend. XIV, § 1.

[11] *See* Alaska Const. art. VI, § 4 (requiring redistricting board to create 20 senate districts, each composed of two house districts).

[12] *See* Alaska Const. art. I, § 1; *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1366 (Alaska 1987) ("In the context of voting rights in redistricting and reapportionment litigation, there are two basic principles of equal protection, namely that of 'one person, one vote' — the right to an equally weighted vote — and of 'fair and effective representation' — the right to group effectiveness or an equally powerful vote." (quoting John R. Low-Beer, *The Constitutional Imperative of Proportional Representation*, 94 YALE L.J. 163, 163-64 (1984))).

7646

house districts. The Board offers several arguments challenging the superior court's decision.

### 1.    Burden of persuasion

The Board contends that the superior court erred as a matter of law by placing the burden of persuasion on the Board to prove it was not illegally discriminating in favor of Eagle River voters and against other voters. This argument is specious. The superior court expressly and clearly stated that it was not placing the burden of persuasion on the Board, but rather on the proclamation plan challengers. The court stated that it was a matter of first impression whether the burden of persuasion should shift after a prior determination of illegal discrimination by the Board, but the court declined to take that step, leaving the question for us to decide if appropriate. The superior court's (1) considering the previous determination of illegal discrimination as a factor in the multi-factor legal test for an equal protection claim, and (2) deciding the East Anchorage and Girdwood Plaintiffs met their burden of persuasion, does not mean the court wrongly placed the burden of persuasion on the Board.

### 2.    Hard look analysis

The Board argues that the superior court erred as a matter of law by continuing to use the "hard look" analysis we rejected in our earlier order.[13] After

---

[13]    The hard look doctrine, which we previously have applied to the Board, determines whether a proclamation plan — like a regulation — is reasonable and primarily concerns whether the Board "has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making." *See In re 2001 Redistricting Cases*, 44 P.3d at 143-44, 144 n.5 (quoting *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 690 (Alaska 2001)) (applying hard look analysis to Board and remanding house districts for reconsideration because Board had not considered certain salient issues).

7646

carefully reviewing the superior court's decision, we conclude that the superior court examined whether the Board took a hard look at salient problems raised by public comments rather than merely counting comments and determining whether the Board followed the majority view. This is in line with the hard look doctrine, and we see no legal error.

### 3.    Equal protection test/conclusion

The Board argues that the superior court wrongfully added a federal law overlay to the multi-factor test used to determine whether redistricting violates equal protection in this context.[14] We disagree. The superior court looked to federal law to assist in determining, as a matter of first impression, whether a prior illegal redistricting discrimination finding may be relevant to determining whether subsequent illegal redistricting discrimination occurred. We see no legal error in the superior court's determination that prior illegal redistricting discrimination may be a relevant factor when, as in this matter, the challenge to the subsequent redistricting plan is based on the

---

[14]    *See Kenai Peninsula*, 743 P.2d at 1372 ("Under such a test we look both to the process followed by the Board in formulating its decision and to the substance of the Board's decision in order to ascertain whether the Board intentionally discriminated against a particular geographic area. Wholesale exclusion of any geographic area from the reapportionment process and the use of any secretive procedures suggest an illegitimate purpose. District boundaries which meander and selectively ignore political subdivisions and communities of interest, and evidence of regional partisanship are also suggestive. The presentation of evidence that indicates, when considered with the totality of the circumstances, that the Board acted intentionally to discriminate against the voters of a geographic area will serve to compel the Board to demonstrate that its acts aimed to effectuate proportional representation. That is, the Board will have the burden of proving that any intentional discrimination against voters of a particular area will lead to more proportional representation.").

same contextual framework and house district pairing for senate districts.

The Board also contends that the superior court came to the wrong conclusion after applying its equal protection analysis, but we disagree. We AFFIRM the superior court's determination that the Board again engaged in unconstitutional political gerrymandering to increase the one group's voting power at the expense of others.

**Interim Plan**

The Board adopted two potential proclamation plans for public presentation and comment and for adoption as the amended proclamation plan, referred to as Option 2 and Option 3B. The Board adopted Option 3B. After ruling that the Board-adopted Option 3B was unconstitutional, the superior court ordered the Board to implement Option 2 as the interim plan for the upcoming 2022 elections to enable legislative candidates to file for office by the June 1 deadline. Because we agree with the superior court that the Board's proclamation plan — Option 3B — is unconstitutional, the issue of an interim plan remains.

The Board seemingly argues that the superior court had no authority to order the Board to adopt Option 2 as the interim proclamation plan. The Board presumably believed Option 2 fulfilled constitutional requirements, or it would not have adopted it for public presentation and consideration for a proclamation. We are about a week short of June 1 and the Board has made no known effort to prepare or present to us an interim plan other than Option 2.[15] We therefore AFFIRM the superior court's

---

[15]     *Cf. In re 2011 Redistricting Cases*, 274 P.3d 466, 468-69 (Alaska 2012) (inviting board to submit proposed interim plan for our approval in light of upcoming election deadlines when remanding final plan to board for further proceedings).

**7646**

order that the Board adopt the Option 2 proclamation plan as an interim plan for the 2022 elections.

### Conclusion

We DISSOLVE THE STAY of the superior court's rulings that (1) the Board's amended proclamation is unconstitutional and (2) the Board adopt the specified interim plan for the 2022 elections. The superior court's remand to the Board for further proceedings on a new proclamation plan for elections after 2022 REMAINS STAYED.

Entered at the direction of the court.

Clerk of the Appellate Courts

Meredith Montgomery

cc:  Supreme Court Justices
     Judge Matthews
     Trial Court Clerk - Anchorage

Distribution:

**7646**



## May 2022 Board Proclamation Statewide
Redistricting Plan Adopted by the Alaska Redistricting Board 05/24/2022

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

**7646**



## May 2022 Board Proclamation Anchorage
Redistricting Plan Adopted by the Alaska Redistricting Board 05/24/2022

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

Appendix E　　　　Page 2 of 3

7646



## May 2022 Board Proclamation Eagle River
Redistricting Plan Adopted by the Alaska Redistricting Board 05/24/2022

Appendix E        Page 3 of 3

Based on 2020 Census Geography and 2020 PL94-171 Data; Map Gallery link: www.akredistrict.org/maps

7646